Kevin L. STETLER, Plaintiff,

v.

Teresa Hagedorn FOSHA, Defendant,

and

Farmers Insurance Company, Inc., Garnishee.

No. 86–1180–C.

United States District Court, D. Kansas.

Dec. 30, 1992.

Jerry M. Ward of Ward & Berscheidt, Great Bend, KS, for plaintiff Stetler.

John A. Bausch of Benfer, Bausch & Blumreich, Topeka, KS, for garnishee Farmers Ins.

Clarence L. King, Jr., Robert M. Adrian, and David S. Knudson, of King, Adrian, King and Brown, Salina, KS, for defendant Teresa Hagedorn Fosha.

## FINDINGS, CONCLUSIONS OPINION, ORDER AND JUDGMENT

WOOLEY, United States Magistrate Judge.

The matter before the Court is a garnishment proceeding against Farmers Insurance Company, Inc., following a trial verdict against the insured, Teresa Hagedorn Fosha (Fosha), and the entry of judgment in excess of the policy coverage limits and in favor of plaintiff, Kevin L. Stetler (Stetler). The garnishment arises from a per-

sonal injury claim resulting from a motorcycle-automobile collision in Manhattan, Kansas on October 5, 1979. Both parties have signed, pursuant to 28 U.S.C. § 636(c), a written consent to have the United States Magistrate Judge consider the record, the parties' respective briefs and arguments, and make findings of fact, conclusions of law and enter judgment. (Dkts. # 105 and 106). Jurisdiction of the action in federal court is premised on diversity of citizenship, and amount in controversy under 28 U.S.C. § 1332(a)(1).

Plaintiff Stetler is represented by Jerry M. Ward of Ward & Berscheidt, Great Bend, Kansas. Garnishee, Farmers Insurance Company (Farmers), is represented by John A. Bausch of Benfer, Bausch & Blumreich, Topeka, Kansas. Defendant Teresa Hagedorn Fosha was represented before and during the two trials of this case by Clarence L. King, Jr. and Robert M. Adrian, of King, Adrian, King and Brown, Salina, Kansas. During 1981, Fosha was also represented by David S. Knudson, while Mr. Knudson was associated with the King law firm.

PREFACE:

This excess judgment garnishment action may not be unique, but it is unlike most of the reported cases on the issues of bad faith and negligence. Liability of one party to the other is not clear-cut. The liability issue is closer than any the court can recall in similar cases in its 36 years as a lawyer and judge.[1] The case has been twice tried to a jury—the first time in the District Court of Riley County, Kansas at Manhattan, and the second time in the Federal District Court in Kansas at Topeka. The jury in the first trial found the majority of fault (70%) was that of the plaintiff motorcycle driver. In the second trial, the federal court jury found 51% of the fault rested with the defendant driver of the automobile and fixed total damages at $275,000.00. Based on the 49/51% fault ratio, the court entered judgment for plaintiff for $140,250.00. Defendant's liability policy had a limit of $25,000.00 for any one plaintiff. Farmers has paid that amount to the clerk of the court and subsequently it was paid to plaintiff's attorney. Plaintiff seeks to hold Farmers liable for the excess of $115,250.00.

What remains for this court to decide is whether Farmers should be held liable for the $115,250.00 in excess of the policy limits and, if that question is decided in the affirmative, whether plaintiff is entitled to reasonable attorney's fees, and the amount of such fees.

A finding of bad faith or negligence in defense of the action results in liability on the part of the insurance carrier for the entire judgment; an opposite finding would result in judgment against the driver of the automobile, (Fosha), for the excess over $25,000.00.[2]

STATEMENT OF FACTS:[3]

The collision occurred on October 5, 1979, at approximately 4:17 in the afternoon, on Denison Avenue in Manhattan, Kansas. Denison Avenue is a wide, two lane, two way, north-south street. At the area of the collision, Denison had a posted 30 m.p.h. speed limit, and was marked by a double yellow line indicating no passing.

Fosha was driving a 1976 Pontiac Ventura accompanied by her younger sister. Fosha, headed east, exited what was known

---

**1.** See for instance the cases of *Rector v. Husted,* 214 Kan. 230, 519 P.2d 634 (1974) or *Bollinger v. Nuss,* 202 Kan. 326, 333, 449 P.2d 502 (1969).

**2.** Although both parties have provided excellent briefs regarding the issues of bad faith or negligence, it is not clear to the court whether Teresa Hagedorn Fosha remains personally liable for the excess judgment, or if Fosha assigned her rights to pursue any claims against her insurance carrier to plaintiff Kevin Stetler in return for a release from personal liability. It *appears* from statements of the parties and witnesses

that Fosha remains personally liable for the judgment.

**3.** The narrative Statement of Facts is derived from the court's FINDINGS OF FACT attached hereto.

The court has acted as factfinder in this garnishment action. Thus the FINDINGS OF FACT appended hereto represent the findings of the court as to all facts necessary to analysis and decision, thereby resolving conflicting versions of relevant occurrences, events, statements and testimonies.

as West Stadium Parking Lot on the Kansas State University campus, and was turning left (north) onto Denison from the driveway which is roughly 100 ft. south of the intersection of Denison and Hunting Avenue. Hunting is the first east-west street crossing Denison at right angles north of the accident scene.

Stetler's southbound motorcycle struck Fosha's car in the extreme rear quarter panel on the driver's side, tearing the rear bumper loose on that side of the car. The motorcycle and Stetler then veered away from the car, and skidded some distance down the roadway before coming to rest. Stetler's injuries were severe, resulting in the amputation of his left leg below the knee a few days after the collision. Fosha and her sister were uninjured. (Findings of Fact Nos. 1–7)

A Riley County police officer promptly arrived on the scene and instituted traffic control measures, emergency services and accident investigation. In the accident report the officer fixed the point of impact one to six inches east of the center line, in the northbound lane of traffic which Fosha was entering. The point of impact was identified by the position of a fluid spill which came from the hydraulic cylinder of Fosha's damaged rear bumper. There were no skid marks or other debris in the roadway. (Fof nos. 8 and 9)

The report contains Fosha's statement that at the time of the collision she was northbound, having completed her turn out of the parking lot, and that her rear bumper was "adjacent to the double yellow line." An automobile driven by Samuel Owen, was immediately behind Stetler's motorcycle. Owen stated he witnessed the collision and indicated his belief that Fosha was southbound in front of Stetler, and that impact was in the southbound lane, on the right rear, rather than left rear, of Fosha's car. Michael Richard, a motorist following

Owen, indicated that Stetler was southbound in the northbound lane of traffic at the point of impact. Statements of witnesses, and Stetler himself, indicated that immediately prior to the collision, Stetler was driving in excess of the speed limit, had passed two cars, the first on the left hand side and the second on the right, and was inattentive. (Fof no. 10, 13, 15 and 16)

At the time of the collision, Fosha was insured by Farmers in a policy issued to Lewis Hagedorn, her father. The policy provided for $25,000.00 maximum bodily injury coverage for any one injured person. (Fof no. 11)

Farmers assigned investigation of the incident to Special Claims Representative Richard Mansfield. On October 9, 1979, Mansfield obtained a copy of the police report and visited the scene of the collision. Statements were obtained from Stetler,[4] Fosha, Owen, Michael Richard,[5] and two pedestrians at the scene, Tami Kater and David Zidek.[6] (Fof nos. 12 and 13)

In his statement, Stetler admitted to passing Owen, whom he knew, at a speed of approximately 35–40 m.p.h., and looking away from the front. When he looked back Fosha's car was in front of him in his lane. Fosha stated she drove to the parking lot exit to Denison, looked both directions, and saw a southbound bicycle approaching her, followed by several cars. Estimating that she had plenty of time to pull out of the parking lot, she did so, and had completed her turn into the northbound lane when the motorcycle appeared and hit her car. (Fof nos. 12, 13 and 14)

Owen's statement was that Stetler was traveling between 55 and 60 m.p.h. at the time Stetler passed him on the right and he states that Stetler had looked away briefly before the impact. Owen stated he thought Fosha's car had turned right onto Denison, and been hit on the right rear

4. Apparently due to the severity of Stetler's injuries, it was October 29th before a statement was taken from him.

5. Owen was driver of the car immediately following Stetler, which Stetler had passed on the right hand or passenger side. Richard was driver of the car behind Owen, which Stetler had also passed, on the left hand or driver side. Richard gave his statement October 9th, Owen October 15th.

6. Kater's statement was taken October 9th, Zidek's November 5th.

side, rather than the left. Owen was definite in placing the point of impact in the southbound lane of Denison. (Fof no. 15)

Richard estimated Stetler was going 40–45 m.p.h. at the time Stetler passed him on the left hand side. He did not notice the motorcycle again until the collision, which he believed occurred on the exact center line of the roadway. Richard never noticed Fosha's car until the collision. (Fof no. 16)

Zidek was walking on the east side of Denison Avenue. Zidek noticed Stetler passing a car on the passenger side, and traveling at approximately 35–40 m.p.h. Zidek was walking away from the scene at the time of impact, and turned at the sound of the collision. Zidek stated he did not see the collision and did not know the location of either the motorcycle or the car when they collided. (Fof no. 17)

Kater was standing on the east side of Denison at a crosswalk roughly opposite the approximate point of impact. She watched Fosha pull out, but never saw the motorcycle until the collision. She felt Fosha's car had completed its turn and was completely on the east side of the center line at the time of impact. (Fof no. 18)

On the basis of his investigation, Mansfield advised Charles Snyder, Branch Claims Manager for Farmers, that "we should not make any [settlement] offer as I do not feel [Fosha] is near 50% negligent and [Stetler] is over 50% negligent." Mansfield filed his official investigative report on November 30, 1979. In that report Mansfield listed Stetler as a potential claimant, due to the serious injury resulting in amputation, and also for damage to the motorcycle. Mansfield summarized the statements of the witnesses,[7] included the police report, photographs and statements. Mansfield's proposed disposition stated:

> Investigation shows there is little or negligence [sic] by 'A' driver [Fosha] in this accident. Although we have no testimony as to the speed of motorcycle at the

time of impact, witnesses will testify that he was definitely speeding prior to impact and 'B' driver [Stetler] admits that he was not watching the road ahead prior to impact, therefore it is felt that 'B' driver's negligence definitely exceeds 50% and that any claim for bodily injury could be successfully defended. No formal claim for bodily injury has been made at this time.

(Fof nos. 19 and 20)

On December 1, 1979, Snyder sent a memorandum to Mansfield in which he asked Mansfield if he could "... please call 'B's' parents and explain our position of non-liability? Then close your file and we will wait for suit." Around December 13, Mansfield replied "I have advised 'B['s]' parents of our position of no liability. They apparently have no insurance to cover the medical bills and I have no doubt they will pursue." (Fof no. 21)

Snyder submitted a summary report to Paul Layman, Jr., Regional Liability Claims Manager, on March 11, 1980. Snyder stated:

> Our investigation indicates that our insured had completed a left-hand turn and was in the northbound lane of traffic at the point of impact. It is apparent through witness statements and the police report that the 'B' driver was at least 51% comparative negligent in his own behalf.
>
> . . . .
>
> We feel this is a defensible case and we should not, at this time, make any offer of settlement in regard to same.
>
> . . . .
>
> It is our opinion through the investigation we have developed that this would be one of contributory negligence in equal amounts on both 'B' and 'A'. Also, our investigation would intend to show that the claimant would be more negligent than the insured due to his erratic

---

7. The summaries in effect note that neither Zidek nor Richard saw the actual impact, and that Owen placed Fosha directly in front of Stetler in the southbound lane at the time of the collision. Kater, on the other hand, placed Fosha at the completion of her turn, and completely across the center line into the northbound lane. Because Owen placed the impact on the right rear of Fosha's car with Fosha driving southbound, Mansfield stated that Owen was "completely confused" after Stetler passed him.

driving and the fact that our insured was in the north lane of travel past the center line at the point of impact as substantiated by the witness statement.

. . . .

[W]e should stand firm on our denial of liability in this matter. We are faced with policy limits of 25/50/10, which we feel would probably not compensate the claimant for the severe injury that he has sustained. I feel we have negotiated in good faith and made our decision known to the claimant in reasonable time and feel that any ensuing litigation should be defended.

(Fof no. 22)

Layman's March 14 response to Snyder agreed that the investigation had been "extensive and timely." However, because the injury was so severe and the coverage so low, Layman requested the file be referred to counsel for preliminary review and recommendations. Layman indicated a concern for the best interests of the insured, and the need to avoid placing the company in the position of having acted in bad faith. (Fof no. 23)

Snyder submitted the complete file to the law firm of King, Stokes, Knudson & Nitz of Salina, Kansas, on April 23, 1980. After reviewing the file, Clarence King, Jr. informed Charles Snyder by letter dated May 5, 1980 of his opinion that more than 50% of the liability rested with the motorcycle operator. King based his opinion on the fact that Stetler was speeding, and was passing at the time of the collision. King went on to state:

... I am assuming that our insured was unable to see the plaintiff's motorcycle at the time [she] pulled out of the parking lot.

This is of course a very dangerous type of situation, mainly because of the very serious injury to a healthy young man, and I suspect that some of the evaluation may rest on the ability of the witnesses to convey the liability picture.

However, on paper, it certainly appears that the plaintiff was more than 50% the

fault of this accident. Because of the very serious nature of this claim, you may wish to consider obtaining sworn court reporter statements from the various witnesses at this time.

(Fof no. 24–32)

Ward officially contacted Farmers on August 7, 1980, informing Farmers that his firm represented Stetler in regard to the collision. Stetler requested notice within ten days if Farmers was willing to discuss settlement of Stetler's claim. Charles Snyder responded on August 20, 1980. Snyder stated that Farmers' position as to liability after investigation of the accident and review of the file by counsel was that Stetler's negligence would bar any recovery in Kansas. (Fof nos. 35 and 36)

Ward filed suit on behalf of Stetler in state district court in Riley County, Kansas on January 13, 1981. Thereafter, Farmers submitted the file to King, Stokes, Knudson & Nitz for defense of the action. The case was initially handled by David Knudson and Robert Adrian.[8] (Fof nos. 37 and 38)

Farmers sent a letter to Lewis Hagedorn and Teresa Hagedorn Fosha on January 29, 1981, to inform them of the suit. The letter stated in part:

This Complaint has been referred to KING, STOKES, KNUDSON & NITZ, P.O. Box 942, 116 W. Iron Ave., Salina, KS 67401 who will enter a defense and protect your interest.

There is no monetary limit to the plaintiff's demand. It is possible that a judgment could be secured in excess of the limits of your insurance policy. You are at liberty, at your own expense, to engage legal counsel to associate with these attorneys.

Please be assured, that whether or not you engage your own counsel, defense counsel will defend this action without cost to you in accordance with the terms of the policy.

---

**8.** Knudson was appointed to serve as a State District Judge in the fall of 1981, at which time attorney Robert Adrian took over the Stetler-Fosha file.

(Fof no. 39) [9]

Adrian was familiar with excess situations and potential conflicts between the insured and the insurer. (Fof no. 48)

On February 24, 1981, Knudson and Robert Adrian met with Teresa Hagedorn Fosha and possibly Lewis Hagedorn as well.[10] According to a memo placed in the file by Knudson, during the meeting the general status of the case was reviewed; they "discussed the excess question' " and reviewed interrogatories submitted by the plaintiff. (Fof nos. 40–47, 55 and 56)

Knudson recalls that during the meeting Fosha and her father were concerned "about liability exposure to her based upon the excess letter that had been received.... And so, they naturally had some questions about the excess letter and we explained to them that it appeared to us from a preliminary investigation, tentatively, that Mr. Stetler was at fault in the accident...." However, at the meeting Fosha and Lewis Hagedorn indicated the case should be defended rather than settled, due to their belief that Teresa was not at fault in causing the collision. (Fof nos. 50, 52 and 57)

Adrian's memory of the February 24, 1981 meeting is that there was discussion regarding the $25,000 policy limit, and that the claim was well above that limit. Discussion also included the idea that Fosha would be personally liable for any judgment in excess of the policy limits, and that she might want to seek her own attorney. Adrian has no recollection whether Fosha was advised at that time that she had a right to make a demand on the company to settle for policy limits. (Fof nos. 49 and 54)

As the parties continued preparation for trial, the depositions of Stetler and Fosha were taken, and Adrian obtained sworn statements from Kater, Owen, Richard and Zidek.[11] (Fof no. 62)

The sworn testimony of the witnesses basically enlarged on their previous statements, with a few significant differences. Witness Tami Kater stated that although she believed Fosha's car was entirely in the northbound lane at the point of impact, she could not be certain of the car's position. (Fof nos. 65 and 71)

Zidek was uncertain whether Fosha's car was over the centerline, although the "majority" of the car was over the centerline after the collision while the motorcycle and driver were still in the air. (Fof no. 64)

Owen's sworn testimony had Stetler's speed down to between 45–50, and Fosha as practically stopped. Furthermore, Owen no longer insisted Fosha had been going southbound, as in his previous unsworn statements. He remained adamant about actually witnessing the impact of the vehicles. He now stated Fosha was headed almost due east, and remained well into the southbound lane of traffic at the time of impact. (Fof nos. 63, 69, 70, 75 and 76)

Richard repeated his earlier statement that he did not see the motorcycle from the time it passed his car until the driver was flying off of the motorcycle after impact.[12] Richard also stated that he had no recollection of the position of the car and motorcycle in relation to the centerline of the roadway independent from the statement to police he made at the time. (Fof no. 66)

In Stetler's deposition, taken by Knudson on April 29, 1981, Stetler again stated he passed Owen's vehicle on Owen's right and

9. A similar letter was sent to Lewis Hagedorn and Fosha on April 28, 1981, after interrogatories indicated the amount of plaintiff's demand. The text of the letter was modified so that instead of reading "no monetary limit," the letter stated "We now have a monetary limit to the plaintiff's demand, specifically 2.5 million dollars." (Fof nos. 58 and 59)

10. Adrian recalls that Lewis Hagedorn was concerned about his personal liability, and had questions regarding the possibility of disposing of certain assets. Lewis Hagedorn has no recollection of attending the meeting. (Fof nos. 51 and 53)

11. The sworn statements were taken by a court reporter on March 25, 1981. The plaintiff was not represented.

12. In Richard's December 12, 1981, deposition he described seeing the motorcycle pass on the left side of the car in front of him prior to the collision. (Fof no. 77)

**1416**

waived at him as he passed. Stetler then believed there were two southbound lanes at that particular point on Denison and that the collision occurred on the west side of Denison. (Fof no. 60)

In Fosha's deposition, taken by Ward on April 29, 1981, Fosha described the collision as she had in her earlier statement to Mansfield and added that she estimated the cars coming toward her from the north were approximately a quarter of a block north of the intersection (of Denison and Hunting) when she pulled out; that after pulling out (onto Denison) she caught a quick glimpse of a man on a motorcycle passing her driver's side window and then there was an impact on the rear of her car. She again mentioned the bicycle being in front of the southbound cars as they approached and remembered seeing the bicycle and rider briefly at the scene of the collision after the impact. (Fof no. 61)

Knudson reported the findings of the ongoing discovery regarding Stetler's claim to Snyder by letter dated June 11, 1981. Knudson reported summaries of the witnesses' statements to Snyder,[13] and updated him as to the issue of liability as it appeared to Knudson at that time:

> As you know, liability is questionable and investigation to date supports a conclusion that plaintiff was more than 50% responsible. The eye witnesses state plaintiff was speeding, inattentive, and right on or over the center line at the time of the accident.
>
> . . . .
>
> It will be necessary for us to take the deposition of the police officer who investigated the accident and pin him down as to his diagram. Once this is completed it may be necessary for us to hire an accident reconstructionist and have him prepare some type of report and/or exhibit regarding the positions of the automobile and the motorcycle at the time of the impact and the speed of the vehicles at the time of collision. From this we should be able to formulate a definite

opinion as to fault. As you will recall, the police officer's report had the accident occurring very near the center line of the road. It is possible that a jury would conclude that defendant should have seen the motorcycle and yielded the right of way. Thus we are quite concerned with the actual point of impact. (Fof nos. 67 and 68)

The deposition of the police officer who investigated the collision and prepared the accident diagram, Steve Schwarm, was taken on September 1, 1981. Counsel for Farmers and Fosha did not obtain an opinion from a collision reconstruction expert until after plaintiff's expert, Ronald Wells, placed the point of impact well into the southbound lane of traffic occupied by Stetler. (Fof no. 81) Farmers expert, Gary Thompson, reported in a letter to Robert Adrian dated April 27, 1982, that it was his opinion that the impact occurred approximately three feet east of the centerline. (Fof nos. 82 and 83)

Between June of 1981 and August of 1982 more depositions were taken from witnesses and the accident reconstruction experts. The deposition of Leonard Komarek was taken on November 4, 1981. At the time of the accident Komarek was Stetler's brother-in-law. Komarek testified regarding a visit he made to the hospital after the accident. He identified Fosha as being present at the hospital, and described overhearing a conversation in which Fosha stated that when she pulled out into the street and saw the motorcycle coming there was no place for her to go so she had stopped. (Fof nos. 73 and 74)

The testimony of Adrian indicates that Fosha was advised prior to the trial in 1983 to obtain outside counsel:

> ... and I informed her I would anticipate a judgment of $500,000.00 or more, if in fact he was successful. I, on more than one occasion, requested that she go seek her own independent counsel. I informed her that she should take the statements we had previously provided,

**13.** Knudson's summary of Tami Kater's statement did not reflect Kater's statement that she could not be certain that Fosha's car had completely crossed the centerline into the northbound lane, but otherwise accurately reflected her previous description of the collision.

together with my discussion with her, and if a judgment was rendered in excess of the policy limits it would be extensive, that in all probability that attorney would send a letter to me demanding that I settle within policy limits. That letter was not binding upon me. I still had to exercise my independent judgment. . . .

(Fof nos. 79 and 89)

According to Adrian, Fosha asked whether she might be able to go through bankruptcy to avoid the judgment. Adrian's response was "I will not discuss with you your rights or options. You need to get independent counsel." (Fof no. 80)

The Stetler–Fosha trial did not begin until February 23, 1983. Prior to the trial (on April 26, 1982), Adrian obtained partial summary judgment holding Stetler was negligent in speeding, which was a contributing cause of the collision. Stetler's lawyer notified Adrian by letter in early February that it was his intention to seek an excess liability judgement against Farmers for bad faith if the verdict was favorable to Stetler. Stetler's letter also sought confirmation that neither Adrian or any member of his office had ever solicited a settlement demand or attempted to negotiate a settlement within policy limits. (Fof nos. 85 and 87)

From the time he became supervisor of the file until the time of trial in state court, King had no recollection of any settlement discussions and did not recall ever considering advising Farmers to negotiate with Stetler. King felt the case was defensible. (Fof nos. 90 and 91)

Adrian reported the status of the case to Snyder in a February 15, 1983 letter. Adrian discussed the notice from plaintiff's counsel, and reiterated the position of counsel regarding Stetler's claims:

This matter is presently set for trial to begin within the next eleven days. In reviewing all the depositions, police report and other pleadings, it is still our position that plaintiff was more than 50% at fault for this accident. Plaintiff has already been found by the court to be negligent as a matter of law in speeding and that this speeding was a proximate cause of this accident. Furthermore, there is no question that plaintiff was passing in a no-passing zone. Plaintiff himself admits that after he passed the car, he was looking off to the side and not watching in front of him. This, coupled with the eyewitnesses' testimony that places our car fully in our lane of traffic and our expert's opinion that places point of impact in our lane of traffic, leads us to the opinion that plaintiff is at fault for his injuries and that defendant, Teresa Hagedorn, should not be responsible for his expenses and damages.

In reviewing all of the documentation, it is my position that even if we had $2,000,000.00 worth of coverage and plaintiff offered to settle this case for $25,000.00, we should not settle with him but proceed to trial.

(Fof nos. 78 and 86)

In the same letter, Adrian provided Snyder with two quotations which Adrian described as the controlling statements of law for Stetler's potential excess liability claim. The quotations, represented to Snyder as Syllabus 4 and Syllabus 7 of the Kansas Supreme Court opinion[14] in *Farmers Insurance Group v. Schropp*, 222 Kan. 612, 567 P.2d 1359 (1977), appear in actuality to be headnotes added to the opinion by West Publishing Company, and as such are not part of the official opinion. The first quotation closely paralleled the actual syllabus, and accurately described that point of law. (Fof no. 86)

The second quotation, identified as Syllabus 7 from the *Schropp* opinion, was misidentified, and did not accurately reflect the law contained in the actual syllabi of the case. Instead, the quotation was a partial description of the key facts which

---

**14.** In Kansas, the Supreme Court justice who authors an opinion is required by statute to file a statement of the points decided, which thereafter becomes the syllabus in the published reports. Kan.Stat.Ann. § 20–111. The syllabus is to be confined to points of law arising from facts in the case, as determined by the court. Kan.Stat.Ann. § 20–203.

the court had identified in holding Farmers, the appellant in *Schropp*, guilty of bad faith in failing to reach settlement in that excess liability garnishment proceeding. The quotation emphasized Farmers's failure to enter settlement negotiations even while knowing the insured was almost certainly at fault for causing the claimant's injuries. Adrian concluded that because "all indications" were to the effect that Stetler was the "major, if not sole, causal factor for the injuries plaintiff sustained," he did not believe Farmers could be guilty of bad faith or negligence in denying Stetler's claims. The letter to Snyder represented the final evaluation of liability for the collision that Farmers would receive from King's law firm prior to the trial. (Fof no. 86)

By letter dated February 18, 1983, to Adrian, Stetler, by his lawyer, Ward, offered to settle for policy limits. At that time, Stetler's medical bills exceeded $22,000. (Fof nos. 84 and 88) The offer was not accepted.

Trial of the case began on February 23, 1983. King and Adrian went to Manhattan two days before the trial to prepare. King's first meeting with Fosha was on Monday of the week of trial. (Fof no. 92). As part of the preparation for trial, they discussed the entire case, which included discussion of the "excess problem." (Fof no. 93). At this meeting King understood Fosha as saying she had consulted with another attorney, Stites.[15] (Fof nos. 104, 107 and 110) King believed Fosha had been advised on several occasions to consult with another attorney, but King never received any calls or requests to examine the Stetler file from any attorney. (Fof nos. 108 and 109) Neither did Adrian. (Fof nos. 111, 112 and 113) Adrian never was contacted by any attorney representing Lewis Hagedorn. (Fof no. 114)

The 1983 trial in state court began with a statement by plaintiff's counsel on the record that Stetler was willing to settle the action for $25,000.00, the limits of the policy coverage. (Fof no. 94) Farmers' Claims Manager was not made aware of the offer until that evening. (Fof no. 95) King, Adrian and Fosha discussed the offer on a bench outside the courtroom. King recalls the conversation:

... and I went over with her again the fact that there had been an offer of settlement for the $25,000, and that she, if she wanted to, I would give her—try to get the Court to give time so she could go talk to John Stites. I was assuming at that point that was her attorney, and talk with him about that offer; and if— again went over; I said, this is the same thing that we discussed yesterday about whether or not you wished to demand the company settle within the policy limits; and because we had gone over not just what would happen, I told her if she went to an attorney—this was before she had gone to John—I had told her if she went to an attorney, probably what would happen is the attorney would look at it, and he would demand that we settle within the policy limits; and at that point in time I would call the company and let them know, and it would be up to the company to make a decision as to whether they were willing to offer the policy limits; and if they didn't, then if there was an excess judgment, it very well could be the company's responsibility rather than hers.

(Fof no. 96)

Fosha indicated her desire to go ahead with the trial. (Fof no. 97)

The information given to Fosha by King and Adrian had consistently indicated that the facts favored resolution of the trial in her favor. (Fof nos. 72 and 78) King and Adrian did, however, tell Fosha that she could lose the case, and if that happened she could be liable for the excess judgment. (Fof nos. 101 and 103) Fosha was also aware that the final decision on an offer of the policy limits belonged to Farmers. (Fof no. 97) There is no question that Fosha consistently maintained she was not at

---

**15.** King did have a brief and casual conversation with Stites following the first trial, which apparently re-enforced his belief that Fosha had consulted with Stites. Stites congratulated King on the favorable verdict reached at the trial. (Fof no. 106)

fault for the collision, and did not believe Stetler should recover from her on the basis of her fault. (Fof no. 98)

The February 23, 1983 trial concluded two days later with a verdict in favor of Fosha, finding 70% fault on the part of Kevin Stetler, and 30% fault on the part of Teresa Hagedorn Fosha. Under Kansas's comparative negligence statute, a plaintiff who is equally or more at fault than the defendant cannot recover. Judgment was entered for defendant. (Fof no. 115)

Stetler appealed. On June 14, 1984, the Kansas Court of Appeals reversed and remanded the case to the trial court. *Stetler v. Fosha*, 9 Kan.App.2d 519, 682 P.2d 682 (1984). The court held that the charge to the jury instructing that Stetler was negligent as a matter of law in speeding and that his negligence was a cause of the collision, was error and was prejudicial to Stetler's case. The court also found that the grant of summary judgment on that point prior to the trial wrongfully invaded the traditional role of the jury to determine causation in a negligence action. Adrian, on behalf of Fosha, appealed the ruling of the Kansas Court of Appeals to the Kansas Supreme Court, but was denied review on September 6, 1984. (Fof no. 116). Stetler's claim was thereafter set for a second trial.

Fosha called Adrian on August 29, 1984. The telephone conversation was summarized in Adrian's memo to the file as follows:

> ... We then discussed the facts of this case and the potential exposure to her if she should lose. I informed her that there was, in my opinion, a good chance of a $1,000,000 judgment against her if, in fact, the fault was shown to be attributable to her and not to plaintiff. She then discussed whether or not this matter should be settled and I informed her that I thought the facts favored her, however sympathy did, in fact, favor the plaintiff. In any event, I instructed her that if she had any questions regarding

whether or not this should be settled, to contact another attorney. She wanted to talk to her parents and other individuals and see what her opinion was regarding settlement, but, that at this time, did not want to inform me either way.

(Fof no. 117)

A number of factors were considered by defense counsel concerning a retrial of the action. Among those were the amount of Stetler's medical bills which had continued to increase over time due to the need for additional operations and difficulty with his prosthesis. King had been favorably impressed by Stetler's quality as a witness in his own behalf, and some of the witnesses were difficult to locate. (Fof nos. 118 and 119)

By letter dated April 9, 1985 to King, Farmers authorized his firm to make an offer of $25,000.00 to Stetler's attorney, Ward. By letter dated April 12, 1985 to Ward, Adrian made an offer, good only for thirty (30) days, to settle the case for $25,000.00. (Fof nos. 120 and 122). Stetler refused and counter-offered to settle for $250,000.00. This offer was in turn refused, and the parties began preparation for a second trial. (Fof no. 123)

Fosha was unaware that Farmers had offered to settle with Stetler for the policy limit. (Fof no. 121)

In December of 1985, prior to the second trial, the action was dismissed without prejudice in the state district court. It was refiled in U.S. District Court at Wichita on March 5, 1986.[16] (Fof no. 124) On April 20, 1987, Fosha, through her counsel, unsuccessfully offered to allow judgment to be taken against her for $25,000.00, inclusive of costs to that date. (Fof no. 125)

The second trial took place in Topeka on May 2, 1987, concluding on May 4. Finding Fosha was 51% negligent and Stetler 49%, the jury in the second trial returned a verdict for $275,000.00. Proportioned for comparative fault, Stetler was awarded $140,250.00.

---

**16.** Stetler was now a resident of Nebraska, creating diversity of citizenship for jurisdictional purposes.

After the second trial in federal court, King met with Fosha and her father (Lewis Hagedorn) and suggested again they consult with independent counsel. (Fof no. 126)

Farmers paid the $25,000.00 policy limit into court. There was no appeal of the federal court trial verdict.

Stetler filed the instant garnishment proceeding against Farmers, alleging bad faith and negligence on behalf of Farmers for failure to timely discuss or negotiate a settlement within policy limits. Preparation for the garnishment action included taking depositions of Fosha, Lewis Hagedorn, Robert Adrian, Clarence King, David Knudson, Charles Snyder, and Richard Mansfield, all in 1988. Additionally, both parties obtained depositions from a number of expert witnesses from the legal and insurance professions.

Fosha testified at her April 16, 1988 deposition that although she was asked on the first day of trial in 1983 whether she wished to request the company to settle, she did not recall being told that the plaintiff had offered to settle his claim for the policy limits. Fosha also testified she never had a professional consultation with any attorney other than Knudson, Adrian, or King regarding the Stetler suit, although she knew she had such a right. (Fof nos. 99 and 128) Her aunt worked for attorney John Stites, but Fosha never talked as a client to Stites and did not obtain independent legal advice from him or any other lawyer concerning her rights. (Fof nos. 105 and 131) Fosha also testified in 1988 that she was never told at any time that if she made the request on the company to settle she might be relieved of liability for any excess, or that the liability for any excess might be shifted to Farmers. (Fof nos. 96, 99, 100, 102, 104 and 132) Fosha did not then recall being told, prior to the first day of the state court trial, she would be responsible for any judgment in excess of $25,000, but would not dispute the statement of Adrian or Knudson that they had explained to her, prior to that time, that

she could be held liable for any excess judgment. (Fof no. 127)

Fosha further testified that no attorney ever advised her that she had the right to demand that Farmers pay the policy limit of $25,000 or less. (Fof no. 130) She understood that what Adrian told her was that if she requested Farmers pay the $25,000 policy limit to Stetler, Farmers would take into account her decision, her feeling, but the final decision was up to Farmers. (Fof nos. 96 and 129)

In January of 1991, both parties consented to assign the proceedings to United States Magistrate Judge John B. Wooley at Wichita. Between July 8 and August 22, 1991, plaintiff and garnishee filed their suggested findings of fact and conclusions of law with memorandums in support. They also delivered to the Magistrate Judge, within a few weeks thereafter, all the trial exhibits in both cases, all the transcripts of the depositions taken before both trials and as a result of the garnishment proceeding and other allied papers and records.

ANALYSIS:

The issues before the court are mixed questions of fact and law regarding the possible bad faith and/or negligence of garnishee-insurance company in failing to timely negotiate toward settlement, within policy limits, on behalf of its insured, with the plaintiff-claimant.

The court sees this case as presenting two specific issues:

First, whether Farmers was guilty of bad faith and/or negligence in declining to negotiate in response to plaintiff's offer to settle, within policy limits, prior to the conclusion of the first trial; and,

Second, if Farmers is so guilty, did Farmers' offer of the policy limits prior to the second trial cure that deficiency?

The following discussion will detail those factors salient to the decision of the court, followed by specific findings of fact and conclusions of law and fact upon which its ruling is based.[17]

In its arguments to the court, Farmers has taken the position that it cannot be guilty of bad faith or negligence for a number of reasons. First, the initial decision that Fosha was not liable for any claims by Stetler was made on the basis of a thorough, timely investigation which initially indicated that Stetler was speeding, passing in a no-passing zone and inattentive immediately prior to the collision. Second, the company took the additional precaution of having its attorneys review the investigative file, and those attorneys also reached the conclusion that the majority of fault rested with Stetler, hence, any claim could be successfully defended. Third, it is Farmers position that Fosha, the insured, was always well advised of developments in the case, and that she steadfastly insisted the action go to trial rather than settle. Finally, after reversal of the first trial verdict, and two years before the second trial, Farmers offered the policy limits to settle the claim. Farmers also points to the fact that the first trial resulted in a verdict in favor of Fosha, and that the finding of percentage of fault in the second trial, 51% to 49%, was as close as possible to still return a verdict in favor of the plaintiff.

Stetler, on the other hand, argues that bad faith and/or negligence existed on the part of Farmers, requiring a finding that Farmers is liable for the amount of the judgment in excess of the policy limits, as well as reasonable attorneys' fees. Stetler argues Farmers adopted and maintained its position of non-liability from the outset, disregarded all unfavorable evidence, and never considered the possibility Fosha had failed to see the motorcycle coming, or had been in the southbound lane of travel when the collision occurred. Stetler also argues Farmers is guilty of bad faith and/or negligence due to its failure to make any attempt to settle before the first trial started, particularly in light of the conflict of interest between Farmers' interests as compared to the interests of Fosha, the insured.

18. In this diversity action in federal court, the controlling law is the relevant state law from the forum of the action, in this case Kansas,

**THE APPLICABLE LAW:**

The duties owed between an automobile insurance carrier and an insured regarding claims which exceed the policy coverage have been well established through a series of decisions in the courts prior to the incidents which the court is now reviewing.[18] The policies and theories serving as the foundation of those duties owed between the parties to an insurance contract have not changed during the several years of this prolonged litigation.

Once an insurer undertakes the defense of the insured's interests against the claims of an injured party, that insurer owes a duty of due care to protect the rights of the insured, particularly as to negotiations to attempt settlement of the claim. *Bennett v. Conrady*, 180 Kan. 485, 489, 305 P.2d 823 (1957). The degree of care owed in the settlement of claims is the care and diligence a man of ordinary care and prudence exercises in the management of his own business affairs. *Id.* at 490, 305 P.2d 823.

An insurer defending an insured or negotiating for settlement on the insured's behalf is bound by the mutual fiduciary relationship between the parties "to exercise reasonable care in conducting the defense or settlement." *Id.* Standard automobile liability insurance policies reserve to the insurer the power to approve or deny settlement of a claim for any amount which is equal to or less than the limit of the policy coverage. When making such a determination, the insurer must give consideration to the insured's interests. "Whether such consideration has been given is measured by the 'good faith test' and/or the 'negligence test'. . . ." *Id.* An insurer which fails to fulfill its duty to the insured may be liable for the full amount of an insured's loss, even beyond the limits of the policy coverage. *Id.* at 489, 305 P.2d 823 (citing *Anderson v. Southern Sur. Co.*, 107 Kan. 375, 191 P. 583 (1920).

also the forum of the incident leading to the claim.

■ The duties of an insurer in defending and settling claims against its insured were closely examined in *Bollinger v. Nuss*, 202 Kan. 326, 449 P.2d 502 (1969). To accomplish the public policy goal of protecting the insured's interests, Kansas allows recovery against an insurer on theories of both bad faith and negligence. Because the insured has surrendered the right to conduct its own defense and settlement negotiations, "both due care and good faith are required of the insurer...." *Id.* at 333, 449 P.2d 502.

When analyzing the duty of the insurer, there are many similarities between the theories of "bad faith" and "negligence.":

[E]ven those jurisdictions following [only] the bad faith rule recognize, at least by implication, that the company must, if it fails to settle, defend with ordinary care, and that negligence in investigation which leads to a mistake in failing to settle is also a breach of this duty of ordinary care of defense.... [T]he two tests have tended to coalesce, so that even those courts which reject the negligence test and apply exclusively the test of good faith, nonetheless, consider the insurer's negligence relevant in determining whether or not the insurer exercised the requisite good faith [citations omitted].

The provisions of the policy requiring the insurer to defend also encompass the negotiation of any settlement prior to trial. **When a claim is made against the insured for an amount in excess of the policy coverage, the insurer's obligation to defend creates a conflict of interest on its part. On the one hand, its interests lie in minimizing the amount to be paid; on the other, the insured's interests, which the insurer is supposedly defending, lie in keeping recovery within policy limits, so that he will suffer no personal financial loss. The conflict becomes particularly acute where there is an offer of settlement approximating policy limits.** The insured's desire to avoid the risk of a large judgment by settling within the limits of the policy, regardless of the merits of the claim, would compel him, were he in charge of settlement negotiations, to accept the offer. The insurer's interest, on the other hand, are prompted by its own evaluation of the liability aspects of the litigation and a desire not to expose itself to payments which do not adequately reflect the dangers that might be involved in pursuing the case to trial. When the settlement offer approaches policy limits, the insurer has a great deal less to risk from going to trial than does the insured, because the extent of its potential liability is fixed.

*Id.* at 335–36, 449 P.2d 502 (emphasis added).

■ An insurer may legitimately consider its own interests, but it must give equal consideration to the interests of the insured, following what has come to be known as the "equal consideration rule." The fiduciary relationship of the parties requires the "utmost" good faith between the parties; failure of the insurer to give equal consideration to the interests of the insured is an act of bad faith. *Id.* at 337, 449 P.2d 502 (citing *American Fidelity & Casualty Co. v. G.A. Nichols Co.*, 173 F.2d 830, 832 (10th Cir.1949)); *see also Kunkel v. Continental Casualty Co.*, 866 F.2d 1269, 1275 (10th Cir.1989) (requiring insurer to give equal, if not paramount, consideration to the interests of the insured in excess liability claim) (citing *S.R. Hazelrigg v. American Fidelity & Casualty Co.*, 241 F.2d 871, 873 (10th Cir.1957)). The equal consideration rule requires consideration of the total risk without regard to who is to bear that risk. In other words, the insurer must determine whether a settlement is acceptable by assessing the total risk as if the insurer itself would be liable for the entire sum, and not just for the amount of the policy limits. *Bollinger, supra*, 202 Kan. at 337, 449 P.2d 502:

The result is that under the negligence test the insurer must conduct itself with that degree of care which would be used by an ordinarily prudent person in the management of his own business, with no policy limits applicable to the claim. Likewise, under the good faith test, the insurer must in good faith view the situa-

tion as it would if there were no applicable policy limits.... [I]t would appear the two rules have tended to merge. In the final analysis, the question of liability depends on the circumstances of the particular case and must be determined by taking into account the various factors present....

[such as] [1] the strength of the injured claimant's case on the issues of liability and damages; [2] attempts by the insurer to induce the insured to contribute to a settlement; [3] failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; [4] the insurer's rejection of advice of its own attorney or agent; [5] failure of the insurer to inform the insured of a compromise offer; [6] the amount of financial risk to which each party is exposed in the event of a refusal to settle; [7] the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and [8] any other factors tending to establish or negate bad faith on the part of the insurer.

*Id.* at 338, 449 P.2d 502 (citing *Brown v. Guarantee Ins. Co.,* 155 Cal.App.2d 679, 689, 319 P.2d 69 (Cal.App.1957). The factors cited by the *Bollinger* court may be considered individually as they apply to the circumstances; not all of the factors need be applicable in any individual case to result in a finding of bad faith or negligence.

■■■■ The existence of bad faith or negligence in an insurer's failure to settle a claim is always a question for the trier of fact.[19]

Something more than a mere error in judgment is necessary to constitute bad faith. The company cannot be required to predict with exactitude the results of a trial; nor does the company act in bad faith where it honestly believes, and has cause to believe, that any probable liability will be less than the policy limits. [citation omitted] **Good faith on the part**

**of the insurer implies honesty, fair dealing and adequate information.**

*Id.* 202 Kan. at 341, 449 P.2d 502 (emphasis added).

■■■ If the investigation of the facts by the insurer indicates potential liability of the insured beyond the amount of the policy coverage, the insurer must communicate that information to the insured, along with any offers of settlement, so the insured may protect his or her interests. *Id.* at Syl. 6.

The rules of law described by the court in the preceding discussions were reiterated in *Rector v. Husted,* 214 Kan. 230, 519 P.2d 634 (1974) and *Farmers Ins. Exchange v. Schropp,* 222 Kan. 612, 567 P.2d 1359 (1977). An additional question was raised in *Rector:* In the absence of any settlement offer on the part of the injured claimant, is the insurer obligated to initiate settlement negotiations? In that case, the insurer elected to go to trial to determine the issue of damages, although there was little question of the fault of the insured in causing the injury. The claimant offered to settle for an amount well below the policy limits, but the insurer declined, believing there existed little chance of a recovery in excess of the policy limits. After a trial on the merits, a judgment exceeding the policy limits was entered in favor of the plaintiff, and the insured was held liable for the entire amount. The Kansas Supreme Court affirmed, finding in that case that due to the impossibility of predicting the results of a trial with any accuracy, the insurer had an obligation to attempt to keep the claim from a jury through a good faith attempt to negotiate a settlement. *See also Potomac Insurance Co. v. Wilkins Company, Inc.,* 376 F.2d 425, 428–29 (10th Cir.1967) (holding submission of liability issue to jury in case presenting a recognized risk of damage award exceeding policy coverage evidences insurer's bad faith).

The decision in *Rector* has been construed to require an insurer to initiate negotiations when no settlement offer is forthcoming from the claimant. *Coleman*

---

19. In a garnishment proceeding, issues of fact are determined by the court as factfinder. *Bol-* *linger v. Nuss,* 202 Kan. 326, Syl. 10, 449 P.2d 502 (1969).

v. *Holecek,* 542 F.2d 532, 536–37 (10th Cir. 1976).

■ It is necessary to make a detailed examination and review of the factual circumstances of Farmers conduct relating to Stetler's claim. The motive of the insurance company in not settling is at issue. A decision not to negotiate toward settlement does not lead to liability if it results from careful consideration of the insured's interest's, as well as those of the insurer. A reasonable business judgment, based at the time on adequate information, becomes no less reasonable merely by contrary insights gained through hindsight. *U.S. Fidelity & Guaranty Co. v. Canale,* 257 F.2d 138, 140 (6th Cir.1958).

## DISCUSSION:

■ In researching the law of bad faith/negligence in insurance litigation, the court has found no case which balances, so precariously, the thin line separating liability from non-liability, as does the case at bar.

The first issue is whether Farmers was negligent or acted in bad faith in declining to negotiate in response to plaintiff's offer to settle, within policy limits, prior to conclusion of the first trial.

Under *Bollinger,* the fact that plaintiff claimed an amount in excess of the policy limit created a conflict of interest for Farmers. That the value of plaintiff's claim, if successful, would exceed the policy limit, was obvious to Farmers and its lawyers. To avoid acting in bad faith, Farmers was required to give equal consideration to the interests of Fosha, the insured, and Farmers' own interests. Equal consideration occurred if Farmers reviewed and acted on the risks as if Farmers itself would be liable for the entire sum, and not just for the amount of the policy limits.

To avoid negligence in the handling of the defense of Fosha, the standard of due care imposed on Farmers was that which would be used by an ordinary prudent person in the management of his own business affairs, with no policy limits applicable to the claim. (*Bennett, supra,* 180 Kan. at 490, 305 P.2d 823)

Eight factors for consideration were identified in *Bollinger, supra,* to assist courts in evaluating the conduct of an insurer regarding bad faith and negligence claims; several of those factors are obviously inapplicable to the case at bar. The factors which do apply relate to the strength of Stetler's claim as to liability, and damages; the quality of Farmers' investigation of evidence damaging to Fosha's position; Farmers' reliance on the advice of its attorneys; the nature of the notice Fosha received regarding Stetler's offers to settle; the financial risk facing each party; and the existence of any other relevant factors.

Evidence is clear regarding the factor of the financial risk posed to the parties. Unquestionably, representatives of Farmers, and the attorneys who later reviewed Farmers' file and undertook the defense of Stetler's claims, recognized that any recovery in favor of Stetler would almost certainly expose Fosha to personal liability beyond the $25,000.00 limits of policy coverage. Farmers began investigation of the accident within four days of occurrence, and was aware from the outset of the severity of Stetler's injury. In statements to Fosha, Adrian estimated that Stetler's injuries could lead to a recovery of $500,-000.00 or even in excess of $1,000,000.00. Farmers' risk was then limited to $25,000 under the policy.

Payment by Farmers of the $25,000.00 policy limits at or before the time of the first trial to compromise Stetler's claim would have precluded any possible risk that Fosha would become personally liable for an excess judgment. However, Farmers declined to negotiate with plaintiff's attorney. If that decision was unreasonable, judged by the standard of an ordinary prudent business person in the management of his own business affairs, Farmers' conduct must be considered negligent.

Farmers' position was that any possibility Fosha would become personally liable for an excess judgment was offset by the potential for successfully defending Stetler's claim, and that the possibility of recov-

ery against Fosha was remote enough that Farmers could "wait for suit on the claim" and avoid any settlement negotiations by defending the suit at trial. By taking this position, Farmers appears to have given insufficient weight to at least two other factors which were indispensable parts of the total equation, i.e. the quality of its investigation, particularly the evidence damaging to Fosha's position (conversely, the strength of Stetler's claims on the liability issue) and the natural sympathy a jury would probably have for a young man with such disfiguring injuries.

Farmers' initial decision that Stetler was legally at fault for his own injuries was made in November of 1979 and immediately communicated to Stetler's family. That decision was based on the statements of Fosha, Stetler, four witnesses, and the police report. As a whole, the information Farmers had indicated that Stetler was exceeding the speed limit by anywhere from 5 to 30 m.p.h., was inattentive, was passing in a no-passing zone, and that impact occurred on the centerline of the road, or just east of the centerline on Fosha's side.

Farmers also had information which indicated that some degree of fault for the collision might rest on Fosha. Fosha had pulled from a private drive (parking lot) onto a public roadway, an act which is accompanied by duties requiring watchfulness and due care on the part of the driver entering the public way. Fosha described looking both directions before entering Denison Avenue, but did not see Stetler approaching on his motorcycle. She described seeing a bicycle approaching on the roadway from a distance before she pulled out. No other witness ever acknowledged seeing a bicycle in the area that day, and it is possible that Fosha mistook Stetler on his motorcycle for a rider on a bicycle. Furthermore, the witnesses disagreed about the lane of traffic in which the collision actually occurred. Any evidence that the collision occurred in Stetler's lane of traffic would be damaging to Fosha's position.

Two of the four witnesses, Richards and Zidek, did not see the vehicles collide, or the location of the vehicles at impact, and therefore could not help identify the location of the point of impact. A third witness, Tami Kater, placed the point of impact in the northbound lane of traffic, but she had not seen the motorcycle before it hit the car. The fourth, Sam Owen, who was following behind Stetler and witnessed the collision, placed the point of impact well into the southbound lane. Owen stated Fosha's car was in a position that made the collision unavoidable. Although Farmers discounted Owen's placement of the point of impact as "hopelessly confused" due to his placement of the impact on the right rear, rather than left rear, of Fosha's vehicle, Farmers was willing to rely on Owen's estimate of Stetler's speed, and Owen's testimony that Stetler passed him on Owen's right, just seconds before impact.

After receiving Mansfield's investigative report regarding the collision, Farmers' next step was to forward the file to its attorneys for review. Although the attorneys were in agreement with Farmers that Stetler was more liable than Fosha for the collision, they did not apportion all fault to Stetler, and identified potential difficulties if a trial should take place. In May of 1980, attorney King agreed that "on paper" it appeared that Stetler "was more than 50% the fault" of the accident. King's assessment of liability was qualified, however he started with an assumption that "our insured was unable to see the plaintiff's motorcycle at the time [s]he pulled out from the parking lot." King further suggested that some of the evaluation would "rest on the ability of the witnesses to convey the liability picture." (May 5, 1980 letter from King to Snyder.)

A year later, by letter dated June 11, 1981, David Knudson told Farmers that "investigation to date supports a conclusion that plaintiff was more than 50% responsible." Knudson went on to state:

> It will be necessary for us to take the deposition of the police officer who investigated the accident and pin him down as to his diagram. Once this is completed it may be necessary for us to hire an acci-

dent reconstructionist and have him prepare some type of report and/or exhibit regarding the positions of the automobile and the motorcycle at the time of the impact and the speed of the vehicles at the time of collision. **From this we should be able to formulate a definite opinion as to fault.** As you will recall, the police officer's report had the accident occurring very near the center line of the road. **It is possible that a jury would conclude that defendant should have seen the motorcycle and yielded the right of way. Thus we are quite concerned with the actual point of impact.** (Emphasis added).

Notably, Knudson assesses the plaintiff's fault at more than 50%, and states additional information is necessary to "formulate a definite opinion." Knudson also highlighted the potential for blame to be assessed to Fosha. When Adrian assumed control of the file in 1981, his assessment of the available information was that "to date, at least 51% of the liability rests with plaintiff Stetler."

When sworn statements were obtained from the witnesses by Adrian in March of 1981, Sam Owen was still adamant about witnessing the point of impact in the southbound lane, and now indicated Fosha seemed to have stopped or been slowing in the roadway. Tami Kater's previous opinion that impact occurred after Fosha's vehicle completely entered the northbound lane was unchanged except she stated she could *not be certain* of that. Francis Zidek, who in previous statements had had no idea where the vehicles were at impact, now stated under oath that the "majority"

of Fosha's car was over the centerline at the point when the motorcycle and driver were still in the air. Michael Richard stated he had no memory of the collision independent of his original statements made in 1979. Thus some room was left to conclude that some portion of Fosha's vehicle remained in the southbound lane at the time of impact. While these statements are not conclusive regarding fault, they reflect some erosion of the favorable previous statements of witnesses which Farmers had relied on (police report statements and unsworn statements to Mansfield shortly after the collision), at least in part, in declining to negotiate toward compromise and settlement.

By the time of the trial in 1983, depositions of the witnesses had been taken. The deposition testimony contained only minor discrepancies from the sworn statements previously obtained by Adrian.[20] Additionally, the deposition of Leonard Komarek (taken November 4, 1981) described a conversation in which Fosha was purported as saying she had pulled into the street, seen the oncoming motorcycle, and because there was no place for her to go, she just stopped. This seems to support Owen's statement that Fosha was stopped or slowing at the time of impact. Also, each party had obtained accident reconstruction expert witnesses. Not surprisingly, Stetler's expert placed the point of impact in the southbound lane. Fosha's expert placed the point of impact in the northbound lane. Both experts were in agreement on one item: the point of impact as located by the police report could not be correct.[21]

20. For instance, Michael Richard now described seeing Stetler pass the car in front of him on the left, or driver's side. Richards previous statements were that he had not seen Stetler from the time Stetler passed Richard until the actual collision. Other witnesses, including Stetler, described Stetler as passing Owen, the driver in front of Richard, on the right hand side.

21. Three theories were advanced regarding the point of impact. The police investigation located the point of impact directly at the location of a fluid spill on the road surface, approximately one inch east of the roadway centerline in the northbound lane. The fluid spill was caused by

hydraulic fluid from a hydraulic cylinder on Fosha's damaged rear bumper.

The plaintiff's expert placed the point of impact approximately four feet west of the centerline, on the theory that as the fluid traveled the vertical distance from the bumper to the ground, the forward motion of the car would cause the fluid to travel in the same direction, and therefore come to rest in the roadway some distance away from the actual point of impact in the car's direction of travel.

The defendant's expert located the point of impact in the northbound lane, east of the centerline and to the north of the fluid spill. The expert theorized that the speed of the piston

In this posture of the facts, should Farmers have considered negotiation or settlement of Stetler's claim? Farmers had never attempted any settlement negotiation with Stetler, and so had not learned or determined the facts and theories Stetler's attorney was prepared to present. Still, by the time of trial, Farmers had completed its investigation. The evidence that Stetler was exceeding the speed limit, was illegally passing, and had looked away briefly before the collision was not disputed. On the other hand, the testimony of witnesses to the collision was far from conclusive, especially regarding the critical point of impact. The location of the point of impact was disputed by both the witnesses and the collision reconstruction experts. Although they were optimistic about successfully defending the case, Farmers' attorneys were cautious in apportioning the amount of fault between Stetler and Fosha, stating only that Stetler appeared to be more than 50% or at least 51% at fault.

Taken from a perspective limited to the information available immediately following the collision, Farmers' 1979 decision that Stetler was primarily at fault was not unreasonable. Farmers had reason to believe that Stetler was speeding, inattentive, passing illegally, and that the collision occurred outside of Stetler's lane of travel. With the exception of the statement of Owen, the information available at the time was weighted heavily in favor of Fosha. Farmers maintained its position of non-negotiation from 1979 through the time of trial in February, 1983 and through a lengthy appeal (first to the Kansas Court of Appeals which reversed the trial court in June, 1984 and then to the Kansas Supreme Court which sustained the Kansas Court of Appeals decision on September 6, 1984) and thereafter until April 12, 1985. During that intervening time Farmers either failed to acknowledge information it possessed that indicated liability for the collision might be assessed to either party if balanced by a jury, or was unwilling to alter its previous position as it acquired new and additional information, most of which was detrimental to the defense of Fosha. It was not until April, 1985 that Farmers was willing to discuss settlement, and made its first offer of policy limits to plaintiff.

Farmers' investigation was adequate to uncover the existence of information which was contrary to the description of events given by Fosha. Farmers apparently chose to ignore the negative inferences in that information. All information negative to Fosha was positive for Stetler in shifting blame for the collision. Curiously, Fosha's initial, and subsequent statements as to what occurred (which depicted her as free from fault) appear not to have ever been seriously questioned by Farmers, at least until it made its first offer in April, 1985. Given the duties of an insurer in an excess claim situation, Farmers' decision at the time of trial not to negotiate placed major emphasis on the evidence favorable to Fosha and appeared to give only negligible weight, if any at all, to contrary evidence favorable to Stetler.

Farmers was not required to "predict with exactitude" the final result of the upcoming trial, but Farmers did owe Fosha a duty to deal fairly and honestly based on all of the available or discoverable information regarding the collision. Farmers possessed adequate information to signal a measurable risk of an adverse decision at trial, yet apparently ignored or discounted that information. Had Farmers considered its fiduciary duty to undertake the defense of Fosha with the care and diligence a man of ordinary care and prudence exercises in the management of his own business affairs, Farmers might not have insisted on taking Stetler's claim to trial on the basis of indeterminate evidence, thereby subjecting Fosha to enormous risk of excess liability, while Farmers risk was capped at a minimal loss, comparatively speaking.

At the time of the first trial, Farmers was aware that Stetler's medical bills were approximately $23,000.00, and that any re-

---

being pulled out of the hydraulic cylinder by the impact with Stetler's motorcycle, would have caused the fluid to travel south, in the direction of the motorcycle, and away from the point of impact before striking the road surface.

covery for Stetler against Fosha would probably greatly exceed the $25,000.00 policy limit, perhaps reaching 100 times that amount (2.5 million), according to plaintiff's prayer. The "equal consideration rule", required Farmers to negotiate and to give to its insured "equal consideration" as it did to its own interests. The failure to negotiate in response to Stetler's offer at the first trial indicates Farmers' position remained the same as it had been from the beginning of its investigation. It is difficult to conclude that Farmers did not place its own interests above those of Fosha when it refused to even consider negotiating toward settlement.

Evidence that Fosha's interests were subordinated to those of the company is found in the depositions of Clarence King and Robert Adrian. Each has stated an opinion that if Fosha's position was reviewed by a disinterested attorney, that attorney would probably recommend that Fosha demand Farmers attempt to settle with Stetler within policy limits.

Adrian described how on several occasions he suggested Fosha obtain independent counsel:

I informed her that she should take the statements we had previously provided, together with my discussion with her ... that in all probability that attorney would send a letter to me demanding that I settle within policy limits.

Deposition of Robert Adrian, pages 61–62 (emphasis added).

King also describes a conversation with Fosha on February 23, 1983, the first day of trial, in which King stated:

... and I went over with her again the fact that there had been an offer of settlement for the $25,000, and that she, if she wanted to, I would give her—try to get the Court to give time so she could go talk to John Stites. I was assuming at that point that was her attorney, and talk with him about that offer; ... I told her if she went to an attorney—this was before she had gone to John—I had told her if she went to an attorney, probably what would happen is the attorney would look at it, and he would demand that we settle within the policy limits; and at that point in time I would call the company and let them know, and it would be up to the company to make a decision as to whether they were willing to offer the policy limits....

Deposition of Clarence King, p. 82 (emphasis added).

The opinion of both trial attorneys handling Fosha's defense was that a disinterested attorney reviewing her position would find it required a demand on Farmers to settle. Both lawyers stopped short of informing Fosha that if she demanded Farmers settle within policy limits, it might well shift, from her to Farmers, any liability for judgment in excess of $25,000.00. The failure of the attorneys who undertook the duty to defend Fosha's interests to take the steps they admittedly believed an independent attorney representing Fosha would take to defend her interests, indicates a higher degree of loyalty of those attorneys to Farmers than to Fosha. Such circumstances are sufficient, the court believes, to show that the failure of the attorneys, and Farmers, to enter settlement negotiations resulted from the promotion of the interests of Farmers over those of Fosha. If the court's analysis is correct, Farmers conduct amounts to bad faith as defined in the applicable case law. (*Bollinger, supra*, 202 Kan. at 337, 449 P.2d 502).

There is additional evidence that Fosha's attorneys placed Farmers' interests over her own. Fosha had been advised from the onset of Stetler's claim that the attorneys would defend her interests to the limits of the insurance contract, even though being paid by Farmers. There is testimony that Fosha was advised on several occasions to obtain independent legal advice regarding possible excess liability. Fosha is consistent in denying that she ever did so. More importantly, there is a lack of evidence that Fosha ever was made to understand the true situation, i.e. that the case could be settled for policy limits with no further expense, time or inconvenience to her, or she could go to trial and run the risk of being found liable for a large sum, possibly

up to $1,000,000.00 in the opinion of Farmers' own counsel.

Adrian and King both indicated a belief that at the time of the first trial, Fosha had consulted with John Stites. Both admit, however, that they never spoke with another attorney regarding Fosha's situation,[22] nor did they share any information from their files with any other attorney. It is difficult to accept the proposition that either King or Adrian would believe that Fosha had received adequate advice as to her potential liability when they were aware that no one had even requested a review of their file, which contained the fruits of two years of discovery efforts.

In theory, Fosha's potential excess liability was not a concern of Adrian and King, because they represented Fosha only so far as the insurance contract provided coverage. Any liability in excess of $25,000.00 would fall outside of the policy. Therefore, when Fosha questioned Adrian about the possibility of avoiding possible excess liability through bankruptcy, it is not too surprising that Adrian responded that she would have to obtain other counsel regarding her best options.

Unquestionably, the potential to compromise the entire claim within the policy limits was an area in which the representation of Fosha and Farmers merged. When Adrian refused to discuss Fosha's options regarding avoiding any excess judgment, he was denying her advice on a subject that potentially fell within his duty of representation, because settlement was one way in which to avoid liability to her.

Again, in 1984, following the first trial and before the second, Fosha asked Adrian during a telephone conversation if Stetler's claim should be settled. Adrian's response was that she should obtain independent counsel if she wanted advice regarding settlement. Adrian's statements clearly reflect a position that advising Fosha regarding settlement was not a part of his duty. His refusal to advise Fosha on this matter, indicates to the court that Adrian felt that advising Fosha in regard to settlement would conflict with his duties to Farmers. Since Adrian's only duty other than advising and defending Fosha was to advise and defend Farmers, by refusing to advise Fosha, Adrian placed the interests of Farmers over those of Fosha.

In arguing its good faith, Farmers places great emphasis on the fact that the insured, Fosha, always insisted that trial was preferable to settlement. Farmers may not escape its duties by placing the responsibility for proceeding to trial on Fosha.[23] The final determination regarding any settlement offer based on the $25,000.00 insurance limit was always strictly that of Farmers.

Adamant insistence on her own lack of fault by the insured is not sufficient reason for the insurer to disregard its fiduciary duties of good faith to protect the interest of the insured. This is particularly true in the present case, where the record before the court contains substantial evidence of a failure to provide adequate information to Fosha to enable her to make an informed decision on the question of potential settlement.

The misinformation provided to Fosha was of a dual nature. First, she was consistently provided with evaluations that heavily favored her chances; and second, those evaluations were provided by attorneys she thought were representing her interests, when in fact their greater concerns appear to have been with the interests of Farmers.

The court has also considered the adequacy of advice Fosha received prior to the first trial regarding her rights with regard to the possibility of an excess verdict. In April, 1988, Fosha testified that she was

---

**22.** King indicated a conversation took place with Stites, probably after the first trial, during which Stites congratulated King on the outcome of the trial.

**23.** If Farmers argues that Fosha's approval was required in order for Farmers to proceed with a settlement offer, Farmers argument that any possible bad faith was cured by the offer of policy limits in 1985 would be seriously impaired because that offer was made without the knowledge or approval of Fosha.

never at any time advised that if she demanded Farmers settle with Stetler, it could possibly have an effect on her eventual liability. Although the file reflects that during the February 24, 1981, meeting between Fosha, Knudson and Adrian the "excess question" was discussed, it is not clear whether this means merely the possibility of an excess verdict was discussed, or that Fosha's legal rights and obligations in regard to Farmers, and the possibility that Farmers' and Fosha's interests might conflict, was discussed. Adrian testified he is unsure whether such a conversation took place during the meeting. Fosha's testimony is that she was never at any time advised that if she demanded Farmers settle with Stetler, it could possibly have an effect on her eventual liability.

Fosha's questions prior to trial regarding avoiding any excess liability pertained to her filing for bankruptcy, and never indicate any awareness that she could possibly shift her liability by demanding settlement. Farmers' correspondence to Fosha indicated her interests would be defended. King states he never met or advised Fosha personally prior to two days before trial. The records before the court do not indicate that Fosha received any advice regarding her potential conflict with Farmers other than statements to Fosha that she should obtain independent counsel. Given this record, and Fosha's firm denials during her 1988 deposition, the court must find that Fosha was never given specific advice regarding the possibility that her interests could be adverse to those of Farmers; or that she could potentially advance her own interests by demanding that Farmers settle. Fosha, therefore, from lack of knowledge, was unable to reach a fully informed decision regarding whether to settle.

It is difficult, if not impossible, to conclude that a fully informed ordinary prudent business person, given a choice between risk of personal liability or neutralization of that risk by payment of the insurance policy limits, for which consideration (the premiums) had already been paid, would accept the risk of trial unless the possibility of adverse judgment was, as a practical matter, non-existent. An in-

sured's interests "lie in keeping recovery within policy limits." *Bollinger, supra,* at 336, 449 P.2d 502.

There are additional circumstances which should be considered. In the week prior to trial, Stetler had communicated a willingness to settle, and an intent to pursue Farmers for bad faith in the event of a favorable verdict. Adrian wrote Farmers on May 14, 1985 to inform them of the plaintiff's position. In the course of that letter, Adrian stated he would not recommend settlement even if the policy coverage was for two million dollars and Stetler would settle for $25,000.00. Adrian ignored the obvious, i.e. that in such circumstances the insurance company would have been gambling with its own money instead of risking the financial well-being of the insured.

The court has carefully examined Adrian's stated reasons for believing Farmers had acted prudently and in good faith. Adrian stated that "all indications are that the negligence of plaintiff himself is the major, if not sole, causal factor for the injuries plaintiff sustained." Adrian apparently ignored or undervalued the potential of existing adverse evidence.

Adrian's letter also discussed the potential for a bad faith claim, citing what he described as the controlling law in Kansas on the issue of an insurance carrier's duty to settle within policy limits. Adrian cited only *Farmers Insurance Group v. Schropp,* 222 Kan. 612, 567 P.2d 1359 (1977), and quoted what he described as the relevant syllabi from the opinion. By statute, Kansas requires judges to write the controlling points of law decided in a case in the form of syllabi which precedes the opinion, and therefore some reliance may be legitimately placed on a statement of law in the syllabi. But what Adrian quoted to Snyder as syllabus 7 from *Schropp* is instead an unofficial headnote found in a West Publishing Company reporter (Pacific Reporter) of Kansas opinions. What was then quoted as an official syllabus is not accurately reflective of the actual syllabi as written by the Kansas Supreme Court Justice who authored the opinion, and does not

accurately reflect the law. The quotation does describe the factual circumstances of that particular case, and places emphasis on the knowledge of the defendant insurance carrier that its insured was clearly liable for the claimants' injuries. Because Fosha was not clearly at fault for Stetler's injuries, Adrian reached the conclusion that Farmers would not be susceptible to a finding of bad faith. Adrian's reliance on the *Schropp* opinion, without reference to other opinions, and particularly his reliance on unofficial and inaccurate headnotes as stating the controlling law in reaching his opinion, was likely to, and may have, misled Farmers. If Farmers' final decision to proceed to trial and deny settlement was based solely on that correspondence, Farmers had neither an accurate understanding of the facts nor of the law on which to make its determination.

It is not the intention of the court to say that an insurance company must attempt settlement within policy limits in every excess liability situation. Cases holding that a good faith determination that the claim may be successfully defended, or that any adverse judgment will be kept within policy limits, remain viable and binding. However, when the evidence is such that a trial verdict may realistically go in either direction, and there is little hope of keeping an adverse judgment within policy limits, an insurer must recognize the fiduciary duty it owes to its insured which requires the insurer to take reasonable steps to protect the insured's interests.

What may have been a reasonable denial of liability in 1979 was certainly less reasonable in 1983, at the time of the state court trial. In the opinion of Farmers' counsel, there was never any question that an adverse judgment would exceed the policy limits. The passage of time between the collision and the trial was adversely affecting the memories of some of Farmers' witnesses. Sworn statements and depositions of Farmers' witnesses contained discrepancies which an able plaintiff's attorney might use to impeach the credibility of a witness at trial. Each side had obtained expert opinions regarding the crucial location of the point of impact, and those opinions were wildly at odds with each other. Testimony of the witnesses conflicted regarding whether the impact occurred on the east or west side of the centerline, and at least one witness had been deposed regarding an admission by Fosha that she had stopped or slowed in the street when she saw the motorcycle coming. The plaintiff had suffered a serious, mutilating injury, which by itself exceeded the limit of coverage, and the potential compensable losses continued to rise due to plaintiff's difficulties fitting the prosthesis and productively re-entering the workforce. Sympathy of the jury, therefore, was also a factor, perhaps a major one.

A realistic re-evaluation of the above factors, as they existed shortly before the trial, would, at the least, have raised serious questions about the likelihood of a successful defense. This conclusion is buttressed somewhat by the fact that sixteen (16) months later, three judges of the Kansas Court of Appeals, based on the same facts, reached essentially the same conclusion. (See 9 Kan.App.2d at 523, 682 P.2d 682).

The record clearly reflects that shortly before the first trial in 1983, Stetler was willing to settle his claim against Fosha for the available $25,000.00 insurance policy limits. It is of little or no consequence that Stetler did not actively pursue settlement or make an offer earlier than he did. The duty to negotiate further in good faith, once plaintiff had made a reasonable offer, was incumbent on Farmers. In that way Farmers could have determined Stetler's willingness to settle for a specific amount, perhaps less than policy limits, and learned the facts and evidence plaintiff's counsel considered most likely to be against Fosha's position and favorable to Stetler's position.

The court has also considered whether the offer of the policy limits to Stetler in April, 1985, after the first trial and more than two years before the second trial, could operate to cure any bad faith or negligence from the previous refusal to negotiate toward settlement. The court has concluded that it does not. Following

the first trial, Stetler successfully appealed and was granted a second trial based on errors in the jury instructions at the first trial. Stetler's medical bills, which had closely approximated the policy limits before the first trial, had greatly exceeded the policy limits by the time of the second trial due to additional operations, necessary medical treatments necessitated by the amputation, and a prosthesis for his leg. Along with the medical costs, any successful claim would have included increased claims for pain, suffering, and lost income. Additionally, Stetler had increased his costs for representation by undergoing a complete trial, an appeal, and a successful fight to prevent rehearing of the court of appeals decision in the Kansas Supreme Court. Given the changed circumstances, at the time of the 1985 offer, Stetler concluded that the policy limits of $25,000.00 were insufficient to compromise his right of action against Fosha. Stetler, instead, counter-offered to settle for $250,000, one tenth of the 2.5 million dollar demand in the prayer of the Complaint. Again, Farmers rejected the counteroffer and made no attempt to continue negotiations. Perhaps if Farmers had then indicated a willingness to negotiate beyond its own policy limits in hopes of resolving the case, the second issue (see page 23 hereof) before the court would pose a different and more difficult question. But that is not the case.

Further circumstances should be addressed. Between the decision of the Kansas Court of Appeals in June, 1984 and Farmers' first offer to settle for policy limits in April, 1985, approximately ten (10) months elapsed. So far as the record before the court reflects, Farmers made no effort to pursue settlement during this period. Farmers had previously rejected plaintiff's policy limits offer of February 23, 1983. Since rejection of that offer, however, other circumstances had been added to the mix. First, the Riley County trial jury, while it held for defendant, found that defendant was 30% negligent, thus indicating its belief that not nearly all the fault was plaintiff's. When considered in view of the fact that the trial jury had been instructed that plaintiff was negligent

in speeding and that his speed was a proximate cause of the collision, it is, in the opinion of this court, a somewhat surprising conclusion.

Second, the Kansas Court of Appeals (which reversed on the basis the above described instruction was in error) concluded, among other things, that "The jury clearly felt that defendant failed to yield the right-of-way since it assessed 30% of the fault to her. If plaintiff's speed had not been overemphasized, the jury might have ruled in his favor." (Page 523, 682 P.2d 682, supra.), and "The evidence is such that the jury could have returned a verdict fixing fault at nearly 100% against either the plaintiff or the defendant." (Page 520, 682 P.2d 682, supra.)

While it is plain that plaintiff felt his case was worth $250,000.00 by April, 1985, he might have taken considerably less ten (10) months earlier, immediately after the Kansas Court of Appeals decision, had Farmers made an effort to negotiate. The court realizes what *might* have happened is pure speculation, but Farmers' failure to pursue settlement, during this period, is fact. That failure is, at least, indicative of the apparent continuing attitude of Farmers, namely that it was sticking with its original conclusion that Fosha's case was defensible, in spite of these considerations.

In Kansas, settlements are encouraged as a matter of public policy. *Bennett, supra*, 180 Kan. at 491, 305 P.2d 823. Because the record reflects that in 1983 Stetler was willing to settle for the policy limits, good faith negotiation by Farmers prior to the conclusion of the first trial could well have resulted in the settlement of all claims by Stetler, as well as preventing both subsequent appeals, a second trial in federal court, and this garnishment proceeding, to say nothing of protecting Farmers' insured from an excess judgment. "In settling and defending actions against an insured, an insurer must act in the best interests of its insured." *Smith v. Blackwell*, 14 Kan.App.2d 158, 791 P.2d 1343, 1346 (1989).

"[A]ll the good faith and settlement offers in the world after suit is filed will

not immunize a company from the consequences of an unjustified refusal to pay which made the suit necessary." [citation omitted].

If an insurer were permitted to "cure" an earlier breach of a fiduciary duty, the policy of encouraging an insurer to exercise due care and attempt to settle claims in a fair and expeditious manner would be undermined. This issue is neither new nor novel and does not create just cause or excuse for failure to pay the excess judgment. *Id.* 791 P.2d at 1347.

The sentiment of the Kansas Court of Appeals expressed in *Blackwell* appears applicable to the present case. While *Blackwell* was not decided until after conclusion of the second *Stetler* trial, the reasoning appears sound, and highly relevant.

FINDINGS AND DECISION:

Accordingly, THE COURT FINDS that Farmers was guilty of bad faith by failing, through its attorneys, to fully inform Fosha with equal consideration for her interests as with Farmers, of her contractual rights and obligations regarding the claims against her, specifically of the existence of a conflict between her interests and Farmers', her right to potentially shift the burden of payment of any excess judgment to Farmers by demanding that Farmers settle within policy limits, or alternatively, making sure that Fosha obtained advice from competent independent legal counsel, prior to the state court trial in 1983.

THE COURT FURTHER FINDS that Farmers was negligent by failing, prior to the conclusion of the trial in state court in 1983, to fulfill its fiduciary duty to Fosha by fully and realistically evaluating the potential for successfully defending Stetler's claim within policy limits, more specifically by not re-examining and reassessing the conflicting evidence before trial and consequently declining to negotiate in response to plaintiff's offer to settle within policy limits.

THE COURT FURTHER FINDS that plaintiff has requested that judgment be entered in favor of plaintiff and against the garnishee, Farmers, for plaintiff's reasonable attorney's fees; that the court, having conducted some research, is in doubt as to whether plaintiff should be allowed attorney's fees under the circumstances of this case and, if so, the amount of attorney's fees which should be allowed. In this regard, the court has spoken orally, by telephone, with counsel, who have agreed that if judgment was entered in favor of plaintiff, they would be allowed a reasonable time to brief those questions. The court may wish to hear oral argument on these questions at a later time convenient for counsel and the court.

IT IS THEREFORE ORDERED that judgment be, and it hereby is, entered on behalf of plaintiff and against garnishee, Farmers Insurance Company, Inc. in the amount of $115,250.00,[24] plus interest thereon at the rate of 6.30%[25] per annum from May 5, 1987, until paid.

IT IS, BY THE COURT, SO ORDERED.

## APPENDIX

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. On October 5, 1979, Denison Avenue in Manhattan, Kansas, was 35 ft. 5 in. in width, carried traffic in two directions, was marked with traffic control indicating a no passing zone and had a speed limit of 30 mph. Plaintiff's Exhibits 4, 5; garnishee's Exhibit 7.

2. On October 5, 1979, at approximately 4:17 p.m. in Manhattan, Kansas, Kevin L. Stetler, plaintiff, was driving a Yamaha motorcycle south on Denison Avenue. As he approached the north driveway of Kansas State University parking lot number 2, located on the west side of Denison Ave-

---

24. This sum represents the judgment entered in the second trial against defendant, less the $25,000.00 limit of the insurance policy, which was paid to the Clerk of the Court by Farmers on August 24, 1987 pursuant to the ORDER of the court (Dkt. # 65), filed August 21, 1987.

25. The rate of interest was fixed by the judgment of the Federal Court at the end of the trial in Topeka.

nue, the defendant, Teresa Hagedorn Fosha, drove a 1976 Pontiac Ventura from the north driveway of the parking lot onto Denison Avenue. A collision occurred between the motorcycle driven by the plaintiff and the vehicle driven by the defendant. Plaintiff's Exhibits 4, 5; garnishee's Exhibit # 7.

3. At the time of the collision, Fosha was accompanied by her younger sister. Deposition of Fosha (4–29–1981), p. 16.

4. Fosha and her sister had gone to the university campus to pick up personal belongings of Fosha's which were inside a building housing a campus swimming pool. After completion of the errand, Fosha drove to the exit of the parking lot and turned left onto Denison Avenue. Deposition of Fosha (4–29–1981), p. 16–17.

5. The motorcycle collided with the automobile on the left rear quarter-panel of the automobile, tearing lose the rear bumper on that side. Plaintiff's Exhibit # 4, photographs 8 and 10.

6. Following the impact, Stetler and the motorcycle glanced off of the car, flipping several times and then sliding to a stop in the roadway. Deposition of Samuel Owen, p. 31.

7. As a result of the collision, Stetler sustained severe injury to his left lower leg requiring amputation a few inches below the knee on October 7, 1979. Plaintiff's Exhibit 16.

8. Steve Schwarm is a member of the Riley County Police Department. He was the first officer to arrive at the collision scene. Schwarm called for assistance, provided emergency aid to Stetler, and conducted an investigation of the collision.

Schwarm located the point of impact of the two vehicles in the northbound lane, approximately 1 to 6 inches east of the double yellow line. The location of the point of impact was identified by a fluid spill on the roadway. Schwarm found no skid marks on the roadway.

Denison Avenue at that point is 35 feet 5 inches wide with the north bound lane being 17 ft. 6 in. and the southbound lane being 17 ft. 11 in. wide. Deposition of Schwarm, p. 1, 6–9, 31–36.

9. The collision of the two vehicles caused damage to Fosha's rear bumper which allowed hydraulic fluid to leak onto the roadway. Deposition of Albert Myers, p. 5. [Meyers was an officer with the Manhattan Police Department who participated in the investigation of the collision.]

10. The official police report regarding the collision indicates that Stetler was southbound on Denison Avenue and that Fosha was eastbound and turning left from a parking lot onto Denison Avenue at the time of the collision. Fosha told police she had completed her turn and was northbound with her bumper "adjacent to the double yellow line." Witness Owen described impact of the motorcycle with Fosha's right rear bumper, and indicated his belief that Fosha was southbound. Witness Michael Richard indicated that Stetler was southbound in the northbound lane at the time of impact. Plaintiff's Exhibit 5.

11. On October 5, 1979, there was in full force and effect a policy of automobile liability insurance issued by Farmers Insurance Company to its named insured, Lewis Hagedorn; the monetary liability limit stated in the policy for accidental bodily injury caused by the insured was $25,000.00 for any one person. Parties' Supplemental Stipulation, ¶ 2. [Lewis Hagedorn is the father of defendant, Fosha.]

12. The deposition of Richard Mansfield was taken on May 12, 1988. Mansfield is a special claims representative for Farmers Insurance Company who handled the investigation of the Stetler–Fosha collision. On October 9, 1979, Mansfield was assigned to investigate the collision. On that day he obtained a copy of the police report and took the statements of Fosha, Richard, and Tamlette (Tami) Kater. He later took the depositions of Owen and David Zidek, and another Farmers agent took the statement of Stetler.

Based on his experience, training, and on-sight investigation, Mansfield reached the opinion that the motorcycle driver was more than 50% negligent in causing the

collision. Mansfield reached this opinion based on indications that Stetler was exceeding the speed limit, was inattentive, was not keeping a proper lookout, and was over the centerline when the collision occurred.

Mansfield did not consider Fosha to be negligent in any way because she stated the motorcycle was not in sight when she exited the parking lot. He had no concern that Fosha might have failed to keep a proper lookout before entering the street.

Mansfield was aware from the damages that any recovery in favor of Stetler would be in excess of $25,000. Mansfield informed Fosha that she would have to pay any judgment in excess of the policy limits. Mansfield further informed Fosha that any demand she made upon the company to settle would have to be considered by the company. He did not advise her to retain an attorney to review her file, or discuss possible legal effects of her making a settlement demand on the company. Deposition of Mansfield, p. 4, 8, 13, 14, 23–24, 43–45, 50–51, 55.

13. Stetler provided a statement regarding the collision to a Farmers' representative on October 29, 1979. Stetler described driving his motorcycle southbound on Denison, indicating he believed the street had two lanes of southbound traffic. Stetler estimated his speed at 35–40 m.p.h. when he passed Owen. Stetler admitted glancing off to his left, and when he looked back a car was broadside in the street in front of him. Plaintiff's Exhibit # 14.

14. Fosha gave Mansfield her description of the collision. As she prepared to exit the parking lot onto the street she looked south and then north. She saw about three cars coming southbound towards her, led by a bicycle. Estimating she had plenty of time, she pulled into the street, turning left, and completed her turn so that her car was entirely in the northbound lane. Only when the motorcycle was even with her driver's door did she see it, and the collision immediately followed.

15. Owen was the driver following Stetler. Owen described the collision to Mansfield in a statement given October 15, 1979. Owen estimated Stetler was driving 55–60 m.p.h. when passing Owen. Owen saw Stetler look to the west, and then back to the front, a second before striking Fosha's car which was in front of Stetler in the southbound lane. Owen first thought Fosha had turned into the southbound lane and that the motorcycle struck the right rear (passenger side), rather than left rear (driver's side), of Fosha's car. When Stetler passed Owen, they were about two blocks away from the site of the collision. Plaintiff's Exhibit 13.

16. Witness Richard provided a statement to the police dated October 5, 1979 in which he indicated that the motorcycle passed him on his left traveling at approximately 40–45 mph, after which the motorcycle passed a green hard top car in front of him in a similar manner, approximately a foot to the left of the yellow median line. Richard indicated Stetler was in the northbound lane at the time of the collision.

Richard also gave a statement to insurance representative Mansfield on October 9, 1979, in which he stated he was traveling southbound on Denison Avenue when a motorcycle passed him going 40–45 mph, after which he did not notice the motorcycle again until it collided with a car headed north on Denison. In that statement, Richard indicated it appeared the impact between the motorcycle and the car was on the exact center line of Denison Avenue. Deposition of Michael Wayne Richard, Exhibit 1, 2.

17. Witness Zidek was walking north on the east side of Denison when the collision occurred. In a statement given to Mansfield on November 5, 1979, Zidek recited seeing the motorcycle headed southbound at about 35–40 m.p.h., pass a car on the right hand side, and seconds later he heard a collision. When he turned around, the motorcycle and driver were bouncing down the street. Zidek was unsure of the location in the street of the car or motorcycle at the time of the collision. Plaintiff's Exhibit 15.

18. Witness Kater was a pedestrian standing on the east side of Denison at the

time of the collision. In her statement to Mansfield, Kater described watching Fosha pull to the street and stop before entering the road. Fosha turned left, pulling into the northbound lane of Denison. Kater believed Fosha's car was completely east of the centerline when the motorcycle "hit the left rear of the car." Kater never saw the motorcycle before the collision. Plaintiff's Exhibit 11.

19. In a letter from Mansfield to Charles Snyder dated on or about November 9, 1979, Mansfield expressed his opinion regarding the cause of the collision:

Charlie—Investigation shows we should not make any offers as I do not feel "A" is near 50% negl and "B" is over 50% negl. I will submit IR with my recommendation.

"A" refers to Fosha; "B" refers to Stetler; and "IR" is an investigative report. Deposition of Mansfield, Exhibit # 1.

20. Mansfield filed his investigative report on the collision on November 30, 1979. In that report Mansfield listed Stetler as a potential claimant, due to the serious injury resulting in amputation, and also for damage to the motorcycle. Mansfield summarized the statements of witnesses, included the police report, photographs and complete statements.

Under the category "Facts of the accident," Mansfield states:

Car 'A' was existing the parking lot driveway on the west side of Denison Avenue headed east and made a left-hand turn to go north on Denison Avenue and as car 'A' completed its left turn to head north in the east lane, 'B' motorcycle, southbound on Denison Avenue, struck the left rear quarter panel of car 'A'.

'A' driver stated that she stopped on the west side of Denison Avenue, looked south and saw no northbound traffic and then looked north and observed two cars southbound on Denison Avenue with the nearest car north of the Hunting Avenue intersection with a southbound bicycle in front of that car so 'A' driver proceeded from the parking driveway to make a left-hand turn to head north on Denison Avenue and states she had completed her left turn and was headed north east of the center line when struck by 'B' motorcycle. 'B' driver states that he was southbound on Denison Avenue about 35–40 mph and states that he was glancing off to his left and when he glanced back to the road ahead, car 'A' was in front of him and he attempted to pull right but struck car 'A'.

The investigative report also includes a proposed disposition;

Investigation shows that there is little or negligence [sic] by 'A' driver in this accident. Although we have no testimony as to the speed of motorcycle at the time of impact, witnesses will testify that he was definitely speeding prior to impact and 'B' driver admits that he was not watching the road ahead prior to impact. Therefore, it is felt that 'B' driver's negligence definitely exceeds 50% and that any claim for bodily injury could be successfully defended. No formal claim for bodily injury has been made at this time.

Deposition of Mansfield, Exhibit # 1.

21. On December 1, 1979, Snyder sent a memorandum to Mansfield in which he asked Mansfield if he could "... please call 'B's' parents and explain our position of non-liability? Then close your file and we will wait for suit."

Around December 13, Mansfield replied "I have advised 'B['s]' parents of our position of no liability. They apparently have no insurance to cover the medical bills and I have no doubt they will pursue."

Plaintiff's Exhibits 18, 19.

22. Snyder forwarded a summary report to Paul E. Layman, Regional Liability Claims Manager, dated March 11, 1980, in which he stated:

Our investigation indicates that our insured had completed a left-hand turn and was in the northbound lane of traffic at the point of impact. It is apparent through witness statements and the police report that the 'B' driver was at least 51% comparative negligent in his own behalf.

. . . .

We feel this is a defensible case and we should not, at this time, make any offer of settlement in regard to same.

. . . .

It is our opinion through the investigation we have developed that this would be one of contributory negligence in equal amounts on both 'B' and 'A'. Also, our investigation would intend to show that the claimant would be more negligent than the insured due to his erratic driving and the fact that our insured was in the north lane of travel past the center line at the point of impact as substantiated by the witness statement.

. . . .

[W]e should stand firon our denial of liability in this matter. We are faced with policy limits of 25/50/10, which we feel would probably not compensate the claimant for the severe injury that he has sustained. I feel we have negotiated in good faith and made our decision known to the claimant in reasonable time and feel that any ensuing litigation should be defended.

Deposition of Snyder, Exhibit # 1.

23. Snyder received a memo from Layman, Regional Liability Claims Manager, dated March 14, 1980, in which Layman acknowledged receipt of a summary report dated 3/11/80, agreeing that an extensive and timely investigation had been made regarding the loss. Layman requested that, because Stetler's injury was severe and the available coverage relatively small, it would be preferable to have independent counsel review the matter for preliminary recommendations. Layman stated that the company wanted to act in the best interests of the insured and avoid any acts in bad faith. Plaintiff's Exhibit # 20.

24. On April 23, 1980, Snyder submitted a copy of the complete file on the Stetler–Fosha collision to the law firm of King, Stokes, Knudson and Nitz, Chartered, Salina, Kansas, requesting a review. Snyder stated:

We investigated and denied 'b' in full. We feel there is less than 50% negligence on our insured's behalf. We request you review and advise your thoughts on possibility of any settlement offer to be made or any BI exposure.

Plaintiff's Exhibit # 21.

25. Clarence L. King, Jr. is an attorney who has practiced law in Salina, Kansas since February, 1957. Deposition of King, p. 3.

26. At the time of the review of the Fosha file, King was generally familiar with the issues of liability of an insurance company for refusing to settle or negotiate a settlement within the policy limits. Deposition of King, p. 19.

27. In making a recommendation to Farmers regarding the Stetler–Fosha file, King was aware of statements by Owen that the Fosha vehicle was southbound in the west lane of Denison Avenue. A more important aspect of Owen's statement was the fact that the plaintiff passed Owen's car at a speed of 55–60 miles an hour, made more significant by the fact that Owen was a friend of the plaintiff. Deposition of King, p. 28–29.

28. On May 5, 1980, King felt he had sufficient information from Farmers to form an opinion that on paper it appeared that plaintiff was more than 50% at fault for the collision. Deposition of King, p. 77.

29. King reached a conclusion that Fosha was less than 50% at fault. Deposition of King, p. 31.

30. In reaching that conclusion King was cognizant of the exposure of Farmers policy limits versus the exposure that the insured faced due to the severity of Stetler's injuries. Deposition of King, p. 31–32.

31. King was aware that Owen had made a statement that Fosha was in the west lane of Denison, in front of Stetler, at the time of the collision, but considered Owen's statement in perspective with the other witnesses, and the report of the investigating officers who showed the impact occurred east of the center line of the street. Deposition of King, p. 48.

32. On May 5, 1980, King provided an opinion regarding the file submitted by Snyder. King wrote Snyder, stating that he had reviewed the file, and was in agree-

ment with the analysis that there was more than 50% negligence on the part of the plaintiff, that it would appear the speed of the motorcycle, in combination with the fact that Stetler was passing, would indicate the majority of fault was on the part of the motorcycle driver.

... Likewise, I am assuming that our insured was unable to see the plaintiff's motorcycle at the time he pulled out from the parking lot.

This is of course a very dangerous type of situation, mainly because of the very serious injury to a healthy young man, and I suspect that some of the evaluation may rest on the ability of the witnesses to convey the liability picture.

However, on paper, it certainly appears that the plaintiff was more than 50% the fault of this accident.

Because of the very serious nature of this claim, you may wish to consider obtaining sworn court reporters statements from the various witnesses at this time.

Plaintiff's Exhibit # 22.

33. Snyder was deposed on April 5, 1988. Snyder was asked whether he ever discussed the advisability of making a settlement for policy limits and closing the file with attorneys King or Adrian. [Adrian was a lawyer with the King law firm.] Snyder replied:

I wouldn't think so. My—throughout the file it was a defensible case and I saw no need to compromise any position. It was a defensible case and liability did not rest with our insured.

That remained "absolutely" Snyder's position even though he was aware of great exposure. Deposition of Snyder, p. 99.

34. At his deposition, Snyder was asked if he was aware that if he denied liability and refused to make an offer of settlement, and the case went to trial and a verdict was obtained in excess of the policy limits, that Fosha would be liable for that excess. Snyder stated that he was aware of the possibility but was not concerned because "I did not feel that a liability—or judgment could be sustained against our insured given the facts of the accident."

Snyder then referred the file to the King law firm for its legal opinion. Snyder sent a letter to Lewis Hagedorn and Fosha dated January 29, 1981, which stated "It is possible that a judgment could be secured in excess of the limits of your insurance policy," which in Snyder's opinion was sufficient to inform the recipients that they would be responsible to pay any judgment secured in excess of the policy limits. Deposition of Snyder, p. 69–71, 76, 83–84.

35. On August 7, 1980, Jerry Ward, counsel for Stetler, notified Russell Cleeton of Farmers that his firm would be representing Stetler with regard to any claims. Ward requested contact if Farmers was interested in discussing settlement of the claim. The letter limited the period of negotiation to 10 days, after which appropriate legal action would be instituted. Deposition of Snyder, Exhibit # 4.

36. On August 20, 1980, Snyder responded by letter to the inquiry from Ward concerning negotiations. Snyder stated that the insurance company had investigated the collision and submitted the file to legal counsel for review. Snyder, for Farmers, declined to solicit a claim from Stetler, stating Farmers would resist any claim filed relative to the Stetler–Fosha collision. Plaintiff's Exhibit # 24.

37. The *Kevin L. Stetler v. Teresa Hagedorn Fosha* litigation was filed on January 13, 1981. Supplemental Stipulations of the Parties, ¶ 3.

38. Farmers assigned defense of the Stetler–Fosha lawsuit to the King firm, initially under the care of David S. Knudson until he left the firm, at which time the case was assigned to Robert Adrian. Deposition of King, p. 42–43.

39. On January 29, 1981, Snyder sent a letter of notice to Lewis Hagedorn and Fosha to acknowledge receipt of the Complaint in *Kevin L. Stetler v. Teresa Hagedorn Fosha*. In that letter Snyder stated:

This Complaint has been referred to KING, STOKES, KNUDSON & NITZ, P.O. BOX 942, 116 W. Iron Ave., Salina, KS 67401 who will enter a defense and protect your interest.

There is no monetary limit to the plaintiff's demand. It is possible that a judgment could be secured in excess of the limits of your insurance policy. You are at liberty, at your own expense, to engage legal counsel to associate with these attorneys.

Please be assured, that whether or not you engage your own counsel, defense counsel will defend this action without cost to you in accordance with the terms of the policy.

Deposition of Knudson, Exhibits # 2.

40. Knudson was an attorney with the King firm in 1981 and worked on the case of *Stetler v. Fosha.* Deposition of Knudson, p. 5.

41. Adrian was an attorney who worked with Knudson on the file. Deposition of Knudson, p. 6–7.

42. Prior to February 24, 1981, Knudson was primary attorney and Adrian assisted. Deposition of Adrian, p. 23.

43. When hired by an insurance company, Knudson always kept firmly in mind that his duty was to the insured and not the insurance company. Deposition of Knudson, p. 27.

44. On February 4, 1981, Knudson informed Fosha by letter that his firm had been retained to represent her in the collision litigation. Deposition of Knudson, Exhibit # 1.

45. After initially reviewing the file regarding the lawsuit, Knudson formed a tentative impression that there was strong comparative fault on the part of Stetler. Deposition of Knudson, p. 7.

46. The basis of Knudson's opinion was preliminary investigation which indicated Stetler was driving at an excessive rate of speed, was inattentive, and possibly was outside of his traffic lane. Deposition of Knudson, p. 8.

47. According to a memo in the file, on February 24, 1981, Fosha and her father, Lewis Hagedorn, met with Knudson and Adrian. At that time Knudson gave Fosha copies of all statements and a copy of the collision report. "Additionally, we discussed the excess question and reviewed the interrogatories submitted to plaintiff." Deposition of Knudson, Exhibit # 1.

48. At the time of the February 24, 1981 meeting, Adrian was familiar with excess situations and potential conflicts between the interests of insured and insurer.

We are defending an insured, we try to keep them properly informed, make them aware and bring them involved into the case, so they know where they stand. We hoped they would have an independent counsel evaluate it for them.

Deposition of Adrian, p. 31.

49. Adrian's memory of the February 24, 1981 meeting between Adrian, Knudson, Fosha and Lewis Hagedorn, is that there was discussion regarding the $25,000 policy limit, of which Fosha was already aware, and that the claim was well above that limit. Discussion also included the idea that she might want to seek her own attorney, and that she would be personally liable for any judgment in excess of the policy limits. Adrian has no recollection whether Fosha was advised that she had a right to make a demand on the company to settle for policy limits. Deposition of Adrian, p. 26–27.

50. During the February 24, 1981 meeting, Knudson recalls that Fosha and her father were concerned

... about liability exposure to her based upon the excess letter that had been received.... And so, they naturally had some questions about the excess letter and we explained to them that it appeared to us from a preliminary investigation, tentatively, that Mr. Stetler was at fault in the accident....

Deposition of Knudson, p. 11.

51. Lewis Hagedorn denies meeting with any representative of Farmers or attorneys King, Stokes, Knudson & Nitz in Salina regarding the Stetler–Fosha litigation. The only time Lewis Hagedorn became aware of possible actions that Fosha might have taken to protect herself from an excess judgment was after the verdict was rendered in the second trial at Topeka, and that was because he overheard a conversation.

Although Lewis Hagedorn received a letter which stated that Fosha was being sued for $2,500,000.00, and he understood that that was more than the limits on his insurance policy, at the time he received the letter he did not understand that to mean Fosha would be liable for any excess judgment.

Lewis Hagedorn was not aware prior to the first trial that an expert witness had placed the point of impact between the motorcycle and the car west of the center line of Denison Avenue. Deposition of Lewis Hagedorn, p. 8, 9, 18, 28.

52. At the February 24, 1981 meeting, Fosha and Lewis Hagedorn indicated the case should be defended rather than settled due to a belief that Fosha was not at fault. Deposition of Knudson, p. 12.

53. During the February 24, 1981 meeting, Lewis Hagedorn was concerned about his personal liability, and had questions regarding the possibility of disposing of certain assets. Deposition of Knudson, pp. 12–13.

54. At the February 24, 1981 meeting, Fosha and Lewis Hagedorn acknowledged they had the right to get an attorney but did not know if they were going to do so at that time. Deposition of Adrian, p. 27.

55. During the February 24, 1981 meeting between Knudson, Adrian, Fosha and Lewis Hagedorn, Knudson raised the issue of excess liability and told them they had the right to make a demand that the case be settled within policy limits. Knudson has no recollection whether he told Fosha and her father at that time that a demand that Farmers settle within the policy limits could change responsibility for a judgment in excess of the policy limits. Deposition of Knudson, p. 25–26.

56. A memo to the file regarding the Feb. 24 meeting indicates the "excess question" was discussed. Adrian recalls discussion at the meeting about the policy limits of $25,000.00 and the potential liability of Fosha for any judgment exceeding that amount. Adrian does not remember if Knudson advised Fosha about any right to make a demand on the company for policy limits. Deposition of Adrian, p. 26–27.

57. From day one Fosha was adamant that she was not at fault for the collision and wanted the claim defended. Deposition of Adrian, p. 63.

58. On April 28, 1981, Snyder sent Lewis Hagedorn a letter to inform Hagedorn of the monetary limit to the plaintiff's demand:

> This complaint has been referred to KING, STOKES, KNUDSON & NITZ, P.O. Box 942, 116 W. Iron ave., Salina, Ks 67401 who will enter a defense and protect your interest.
>
> We now have a monetary limit to the plaintiff's demand, specifically 2.5 million dollars. It is possible that a judgment could be secured in excess of the limits of your insurance policy. You are at liberty, at your own expense, to engage legal counsel to associate with these attorneys.
>
> Please be assured, that whether or not you engage your own counsel, defense counsel will defend this action without cost to you in accordance with the terms of the policy.

Deposition of Knudson, exhibit # 3.

59. Fosha recalls receiving a letter stating that the plaintiff was seeking $2,500,-000. In the letter it stated "It is possible that a judgment could be secured in excess of the limits of your insurance policy. You are liberty at your own expense to engage legal counsel to associate with these attorneys." Her understanding of the meaning of those statements was that the

> ... insurance company was referring these ... referring me to these attorneys that they would be paid for, and that if I wanted my own representation, that I could, but that I would have to pay for them myself.

Deposition of Fosha, p. 91–92.

60. Knudson took the deposition of Stetler on April 29, 1981. Stetler admitted in his deposition that he had waived at Owen as he passed on the right hand side of Owen's automobile, and that it was his belief that at that location there were two southbound lanes. Stetler also testified

that the collision occurred on the west side of Denison. Deposition of Stetler, p. 51, 53, 54.

61. Ward took the deposition of Fosha on April 29, 1981. Knudson was present on behalf of Fosha and cross-examined her. Fosha indicated that prior to pulling out on Denison she looked south and north. To the north she saw a bicycle coming towards her. Two or three cars followed in a row behind the bicycle. After looking north to estimate the speed of the bicycle, she pulled out, making her left hand turn. Fosha estimated that the cars coming from the north were approximately a quarter of a block to the north of the intersection of Denison and Hunting when she pulled out.

After pulling out, she caught a quick glimpse of a man on a motorcycle passing her driver's side window and then were was an impact on the rear of her car. Fosha remembered seeing the man on the bicycle briefly at the scene of the collision after the impact. She had no idea who the man was. Deposition of Fosha, p. 16–18, 22–23, 36.

62. On March 25, 1981, Adrian took sworn statements from Kater, Zidek, Owen, and Richard. Deposition of Adrian, Exhibits # 3, 4, 5, and 6.

63. On March 25, 1981, Owen stated under oath that he was driving a car southbound on Avenue when Stetler passed him on the right hand side and then returned to the middle of the southbound lane of Denison. After passing Owen, Stetler looked back over his right shoulder, and looked around again so that he was not looking exactly in front of him. At this time Owen saw the Fosha vehicle pull out in front of Stetler. In Owen's judgment, Fosha's automobile was headed due east out of the parking lot at the time of impact. Owen estimated that Fosha's car was approximately one-third of the distance out of the southbound lane on Denison, and that Stetler's speed was possibly between 45 and 50 mph at the point of impact. Owen estimated at the time Stetler passed Owen's automobile, Stetler was traveling around 55 mph. Sworn statement of Owen; deposition of Adrian, Exhibit # 4, ps. 6–12, 17–18.

64. Zidek gave a sworn statement to Adrian on March 24, 1981. At that time he described what he observed happening before and after the collision. Zidek was a pedestrian on the side of Denison Avenue. Zidek saw a motorcycle pass a car on the right hand side, watching it until it had passed the vehicle, and then he proceeded to walk north. On hearing the sound of the collision, Zidek turned and witnessed the motorcycle and rider in the air. Zidek estimated the speed of the motorcycle as it passed the automobile at 35–40 mph, prior to the collision. When asked if he saw the position of the automobile at the time of impact, Zidek stated that the vehicle was turning to go north, and wasn't completely north and south. He was unsure whether the impact from the motorcycle had turned the vehicle, but it was facing in a north to northeast direction. Zidek was unable to tell if the automobile was completely over the center line into the northbound lane of traffic, but the majority of the vehicle was over the center line. Deposition of Adrian, Exhibit # 5, statement of Zidek, p. 6–11.

65. Adrian took the sworn statement of Kater on March 25, 1981. Kater was a pedestrian at the time of the collision, standing at the crosswalk immediately adjacent to where impact occurred. Kater was on the east side of Denison waiting in a crosswalk when she saw the Hagedorn vehicle pull out of the parking lot onto Denison. From where Kater stood, at the point of impact it appeared the car had completed its turn into the northbound lane of traffic, but Kater was not certain that the car was completely across the centerline of the roadway.

Kater did not see the motorcycle until impact, but could tell the motorcycle was traveling "pretty fast." Deposition of Adrian, Exhibit # 6, statement of Kater, p. 5, 10, 14.

66. Richard was a witness to events immediately before and after the impact between Stetler's motorcycle and Fosha's automobile. Adrian took a sworn statement from Richard on March 25, 1981. At

that time Richard stated he was traveling southbound on Denison when Stetler passed him on the left. Richard did not see Stetler pass the car in front of him and had no remembrance of the relation of Stetler's position or the point of impact to the centerline of the road other than what was contained in the police report given shortly after the collision. Deposition of Adrian, Exhibit 3, p. 6, 8, 12.

67. On June 11, 1981, Knudson sent a letter to Snyder. At that time depositions had been taken from Stetler and Fosha, and transcribed sworn statements had been taken from witnesses Owen, Kater, Zidek and Richard. The letter stated in part:

As can be seen by Interrogatory Number 17 and 18, plaintiff is claiming a total loss of $2,550,000.00, $2,000,000 of which is for pain, suffering, mental anguish and disability. Medical expenses to date are $21,512.58 with estimated future medicals ranging from $10,000.00 to $25,-000.00. The remainder of plaintiff's damage claim is for anticipated loss of earnings.

As you know, liability is questionable and investigation to date supports a conclusion that plaintiff was more than 50% responsible. The eye witnesses state plaintiff was speeding, inattentive, and right on or over the center line at the time of the accident.

Plaintiff contends he was not over the center line, that the defendant pulled out in front of him, and that by instinct he attempted to avoid hitting the car but was unsuccessful. Sam Owen, eye witness to the accident, states that at the time of the accident defendant Fosha had not yet crossed the center line and was broadside in plaintiff's line of traffic. Mr. Owen will testify that plaintiff had nowhere to go and could not avoid the accident. Furthermore it is his testimony that the motorcycle hit the back quarter panel almost head on. Remember, however, that Mr. Owen is a witness who initially had the defendant's vehicle traveling in a southerly direction rather than

a northerly direction. Thus, his reliability is somewhat in question.

. . . .

It will be necessary for us to take the deposition of the police officer who investigated the accident and pin him down as to his diagram. Once this is completed it may be necessary for us to hire an accident reconstructionist and have him prepare some type of report and/or exhibit regarding the positions of the automobile and the motorcycle at the time of the impact and the speed of the vehicles at the time of collision. From this we should be able to formulate a definite opinion as to fault. As you will recall, the police officer's report had the accident occurring very near the center line of the road. It is possible that a jury would conclude that defendant should have seen the motorcycle and yielded the right-of-way. Thus, we are quite concerned with the actual point of impact.

Deposition of Knudson, Exhibit # 1.

68. On June 11, 1981, Knudson's opinion was that Stetler was more than 50% responsible for the collision. Deposition of Knudson, p. 14.

69. Knudson was aware from the beginning that witness Owen had stated that the collision took place in the southbound lane of travel. Knudson was also aware that Owen's statement had Fosha's vehicle turning south on Denison; that in his later sworn statement Owen stated Fosha was going east but remained well in the southbound lane of traffic at the time of impact. Owen's statement did raise questions in Knudson's mind about where the actual point of impact was. Deposition of Knudson, pp. 21–22.

70. Knudson was also aware that the collision report of the Riley County Police Department put the point of impact very near the center line. Deposition of Knudson, p. 22.

71. Adrian took the deposition of Kater on September 1, 1981. At that deposition Kater was asked where the left rear section of the car was in reference to the yellow center line on Denison at the time of impact. Kater stated that the vehicle had

made its turn and was almost straightened out, "so I'd say her back left bumper was across the line." Kater estimated the speed of the motorcycle at the time of impact at between 40–45 mph. At that time Kater had experience driving motorcycles, and had owned a motorcycle for eight years. Deposition of Kater, p. 22–24.

72. On September 2, 1981, Adrian wrote Snyder in order to update Snyder on the status of the Stetler–Fosha litigation. Adrian stated:

> From the depositions taken to date, it appears that most everyone agrees that the point of impact was somewhat to the east of the yellow line in the northbound traffic. This would place the motorcyclist over the yellow lines in the northbound lane. Furthermore, all witnesses agreed Mr. Stetler was speeding and was also passing in a no passing zone. Thus, to date, it would appear from a legal standpoint, at least 51% of the liability rests with plaintiff Stetler.

Plaintiff's Exhibit # 33.

73. Adrian took the deposition of Leonard Komarek on November 4, 1981. At the time of the collision Komarek was Stetler's brother-in-law. Komarek testified that on the day of the collision he had gone with Stetler's sister to the hospital to visit Stetler, and overheard the defendant Fosha stating that she had pulled out into the street, saw Stetler coming on the motorcycle, and because there was no place for her to go she had stopped. Deposition of Komarek, p. 3, 9, 12.

74. Following the deposition of Komarek, Adrian sent Snyder a status letter regarding the file dated November 5, 1981. Adrian enclosed a memo to the file, which stated in part:

> Leonard is the ex-brother-in-law of Kevin. He presents a problem for us in this matter.... It was his impression from the conversation that she was admitting fault for the accident and that Kevin had nowhere to go on his cycle.... This was the first time anyone has directly taken this position regarding the accident causation.

Plaintiff's Exhibit # 34.

75. Adrian took the deposition of Owen on December 12, 1981. In that deposition Owen stated that Stetler passed Owen's vehicle on the right at a speed estimated at 45–50 mph. After passing, Stetler remained closer to the curbline of the southbound lane than he was toward the center line of the southbound lane. Owen stated that Stetler had glanced to the right, at which time Fosha's car pulled out in front of Stetler, and there was not enough time to avoid the collision.

Owen testified that at the point of impact the car was approximately perpendicular to the southbound lane of traffic on Denison Avenue, and had not established which direction it would be proceeding on Denison. Owen saw the impact. Owen further stated that at the time of impact, Fosha's vehicle was barely moving, that there was no "noticeable velocity". Owen indicated that at the time of impact Fosha's vehicle was approximately at a 45 degree angle to the center line of Denison. Owen later stated that he was not clear which direction the car was headed. The speed of the vehicle was negligible but the direction was unclear.

Owen stated there was no doubt in his mind that the car was in the southbound lane of travel at the time of impact. Deposition of Owen, p. 23, 24, 28, 31, 38, 39, 40, 52, Exhibit 1.

76. Following the deposition of Owen, Adrian sent Snyder a status letter dated December 14, 1981. Adrian enclosed a memo to the file, which stated in part:

> At first Mr. Owen testified the car which was struck by Mr. Stetler was stopped perpendicular to the middle line of Denison in the southbound lane of traffic. It was also his testimony that Mr. Stetler was traveling along the west curb line at time of impact. It was also his testimony that there was not enough room for Mr. Stetler to miss hitting the car on the west side of the southbound lane.... Mr. Owen finally admitted not really knowing the position or direction of de-

fendant's automobile at time of impact; however, he was adamant impact occurred along the west curb line and not in the center of the road. There is no other testimony from any other witness to support this position.

Plaintiff's Exhibit # 36.

77. Adrian took the deposition of Richard on December 12, 1981. In that deposition, Richard indicated that Stetler passed his car on the left, and then proceeded to pass the car in front of him on the left. Richard placed the point of impact between the center line of the road to a foot left (east) of the center line, and estimated Stetler's speed at between 40 and 45 miles per hour. Deposition of Richard, p. 10, 16.

78. Adrian's position from the point he became involved with the case was that the liability side was strongly in favor of Fosha and that plaintiff was more than 50% at fault. Deposition of Adrian, p. 40.

79. On more than one occasion Adrian requested Fosha to seek her own independent counsel.

… and I informed her I would anticipate a judgment of $500,000.00 or more, if in fact he was successful. I, on more than one occasion, requested that she go seek her own independent counsel. I informed her that she should take the statements we had previously provided, together with my discussion with her, and if a judgment was rendered in excess of the policy limits it would be extensive, that in all probability that attorney would send a letter to me demanding that I settle within policy limits. That letter was not binding upon me. I still had to exercise my independent judgment and given the liability factors, but that if at the time of trial we lost and you could establish that I was acting in bad faith or negligently, that she at least would have an argument that she was not liable for the excess proceeds, and that Farmers Insurance Group or myself should pay that.

Deposition of Adrian, p. 61–62.

80. In conversations with Fosha concerning her exposure, she discussed with Adrian the possibility of filing for bankruptcy to get rid of the judgment. Adrian replied "I will not discuss with you your rights or options. You need to get independent counsel." Deposition of Adrian, p. 62.

81. On February 19, 1982, Adrian sent a status letter to Snyder regarding the Fosha file. Adrian informed Snyder that Stetler had provided the report of an accident reconstruction expert (Ronald Wells) who believed the point of impact of the vehicles was on the west side of the roadway centerline, in Stetler's lane. Adrian stated:

As can be seen, their expert places the point of impact to the west of the centerline of Denison Street. With this report it would appear that plaintiff will be able to get to a jury the question of defendant's negligence, if any. At first we thought we might have a shot at summary judgment on the issue of liability, however, with their expert's report, it would appear this is not possible.

Plaintiff's Exhibit # 38.

82. Adrian received a letter, dated April 27, 1982, from Gary L. Thompson, a consulting engineer hired by King and Adrian, which related the results of Thompson's investigation concerning reconstruction of the collision. Thompson's conclusion was that the point of impact was approximately three feet east of the center line of Denison, and 16–17 feet north of the fluid spill identified by the investigating police officer as the point of impact. Thompson found support for that theory by consideration of the turning radius of the automobile, damage to both vehicles, and the relative location of the spilled fluid. Thompson estimated the speed of the motorcycle at time of impact at 51.8 mph, and concluded that had the motorcycle been traveling the legal speed the collision would not have occurred.

Deposition of Adrian, p. 111–112, Exhibit # 7.

83. Neither Wells, plaintiff's expert witness on collision reconstruction, nor Gary Lee Thompson, defendant's expert witness on collision reconstruction, agreed with the location of the point of impact reached by

police investigators. Deposition of Gary Lee Thompson (August 18, 1982), p. 51.

84. By letter dated February 18, 1983, attorney Ward conveyed to Adrian Stetler's offer to settle for policy limits. The offer was not accepted. Stetler's medical bills had exceeded $22,000.00. Plaintiff's Exhibit 40, 42.

85. Plaintiff's counsel (Ward) communicated by letter with Adrian on or about February 10, 1983, confirming that Adrian or members of his office had never solicited a settlement demand from plaintiffs on behalf of Stetler. The letter further indicated that in the case of a successful verdict, it was the position of plaintiff that Farmers in refusing to solicit a settlement demand and/or attempt to negotiate a settlement within policy limits, had disregarded its contractual duties, making Farmers liable for the full amount of damages. Plaintiff's Exhibit # 40.

86. On February 15, 1983, prior to the first trial Adrian wrote Snyder to inform him of plaintiff's position regarding Farmers actions and to update Snyder as to the evaluation of Fosha's liability:

> Please find enclosed a copy of a letter from plaintiff's attorney together with the attachments sent by him. As can be seen, they take the position that they will proceed against Farmer's Insurance Group for bad faith in attempting to settle this action. As you will recall, initially, after reviewing the file, it was our opinion that plaintiff was more than 50% at fault for this matter and that, therefore, no settlement should be made, at least pending discovery. This matter is presently set for trial to begin within the next eleven days. In reviewing all the depositions, police report and various other pleadings, it is still our position that plaintiff was more than 50% at fault for this accident. Plaintiff has already been found by the court to be negligent as a matter of law in speeding and that this speeding was a proximate cause of the accident. Furthermore, there is no question that plaintiff was passing in a no-passing zone and passing on the wrong side of the car in a no-passing zone. Plaintiff himself admits that after he passed the car, he was looking off to the side and not watching in front of him. This, coupled with the eyewitnesses' testimony that places our car fully in our lane of traffic and our expert's opinion that places point of impact in our lane of traffic, leads us to the opinion that plaintiff is at fault for his injuries and that defendant, Teresa Hagedorn, should not be responsible for his expenses and damages.

> In reviewing all the documentation, it is my position that even if we had $2,000,-000 worth of coverage and plaintiff offered to settle this case for $25,000, we should not settle with him but proceed to trial. The facts are such that it is our opinion plaintiff should not prevail and, consequently, we would not then be liable for any of his expenses or damages. In reviewing the case law, I do not believe we were in bad faith in proceeding in the manner in which we have. *Farmers Insurance Group v. Schropp*, 222 Kan. 612, 567 P.2d 1359 (1977) states the law of Kansas relating to a carrier's duty to settle within policy limits. At Syll. 4, it is stated:

>> "Duty of a liability insurer to settle a claim arises if the carrier would initiate settlement negotiations on its own behalf were its potential liability equal to that of its insured."

> At Syl. 7, the court goes on to state:

>> "Evidence, including evidence that at time offer to settle within policy limits was made liability insurer knew that claim would be substantial and that medical expenses alone exceeded policy limits *and* knew that its insured's negligence caused the injuries and insurer required the injured party to petition for letters of administration of the estate of the deceased insured and actively oppose the appointment of anyone other than insured's father and denied liability for more than four years after collision, supported finding that the insured acted negligently or in bad faith and was liable in excess of policy limits." (Id.)

**1446**

As can be seen, in the *Schropp* case, it was clear that defendant's negligence caused the injuries. In our situation, this is not the case. To the contrary, all indications are that the negligence of plaintiff himself is the major, if not sole, causal factor for the injuries plaintiff sustained. Thus, I do not believe we have acted in bad faith by denying their claim and telling them early on we did not believe we were liable for plaintiff's injuries.

If you have any questions regarding the above or plaintiff's letter to me, please feel free to contact me at any time. We will proceed to trial on this matter on February 23, 1983 and will report to you directly following a verdict reached by the jury.

Plaintiff's Exhibit # 41.

87. Prior to the first trial, Adrian never contacted plaintiff's counsel for the purpose of soliciting a settlement demand. Deposition of Adrian, p. 57.

88. Adrian recalls that prior to the first trial Stetler's special damages were approximately $23,000. Deposition of Adrian, p. 61.

89. Adrian never doubted that if Stetler were to prevail at trial, he would receive a damage verdict in excess of $25,000. Deposition of Adrian, p. 60.

90. From the time King became supervisor of the file until the time it was ready to go to trial he has no recollection of any discussions of settlement. Deposition of King, p. 55.

91. King has no recollection of ever considering advising Farmers to enter into settlement negotiations with Stetler. King felt it was a defensible case from the outset. Deposition of King, p. 61.

92. The first personal contact King had with Fosha was at the hotel in Manhattan on Monday prior to trial. Deposition of King, p. 59.

93. King and Adrian met with Fosha on the Monday prior to trial to prepare her and go over the entire case. At that time they discussed the "excess problem."

King believes, but can not be sure, that Fosha had previously had discussions of her low policy limits with Mansfield. Fosha had also discussed her low policy limits with Knudson and Adrian, and with Adrian individually. Deposition of King, p. 54–55.

94. On the first day of trial Stetler's attorney made an offer on the record to settle Stetler's claim for the policy limits of $25,000. King and Adrian discussed that demand with Fosha in the hallway of the courthouse immediately following the offer by plaintiff's counsel. Deposition of King, p. 65.

95. The demand for settlement was probably not relayed to the insurance company claims manager until that evening. Deposition of King, p. 66.

96. After demand had been made by plaintiff to settle for the policy limits of $25,000 on the first day of trial, King, Adrian and Fosha met on a bench outside the courtroom door and discussed the offer of settlement.

... and I went over with her again the fact that there had been an offer of settlement for the $25,000, and that she, if she wanted to, I would give her—try to get the Court to give time so she could go talk to John Stites. I was assuming at that point that was her attorney, and talk with him about that offer; and if—again went over; I said, this is the same thing that we discussed yesterday about whether or not you wished to demand the company settle within the policy limits; and because we had gone over not just what would happen, I told her if she went to an attorney—this was before she had gone to John—I had told her if she went to an attorney, probably what would happen is the attorney would look at it, and he would demand that we settle within the policy limits; and at that point in time I would call the company and let them know, and it would be up to the company to make a decision as to whether they were willing to offer the policy limits; and if they didn't, then if there was an excess judgment, it very well

could be the company's responsibility rather than hers. Deposition of King, p. 82.

97. On the first day of the first trial, after plaintiff's counsel made a demand for the policy limits, Adrian and King discussed with Fosha her position, restating that up until that time she had indicated she did not want the case settled. They informed her that if she lost there would be an excess judgment against her, and at that time they were willing to contact the insurance company to see if they would pay the $25,000 policy limits if she requested they do so.

> We again informed her at that time, though, that simply because she wanted it settled did not mean the company would settle it. It was something the company would take into consideration. They may or may not. She indicated that she did not want the case settled....

Deposition of Adrian, p. 104.

98. After plaintiff's claim for settlement within policy limits was made known to Fosha on the first day of trial, she was still prepared to go ahead and try the case. Deposition of King, p. 84.

99. On the first day of the first trial, Fosha was asked whether she would like to go ahead with the trial. She was aware that she would be liable for any judgment in excess of policy limits, but does not recall being told that the plaintiff had offered to settle for the policy limits. Deposition of Fosha, p. 43, 77.

100. Fosha denies that on the first day of her first trial she was told by King that if she called an attorney for advice, that attorney very well would demand that the company pay the policy limits. Furthermore, she was never told that if she made the request for the company to settle that she might be relieved of liability for any excess verdict. Deposition of Fosha, p. 96, 97.

101. King and Adrian consistently told Fosha that hers was a defensible case, and they also made known to her that it was possible she could lose the case and would then be responsible for any judgment in excess of the policy limits. The attorneys never informed her that if she requested settlement within policy limits, liability for the excess judgment could be shifted to the company. Deposition of Fosha, p. 83–84.

102. Adrian advised Fosha that she would be responsible for a judgment in excess of the policy limits either at the time of the first trial or shortly before the first trial. Adrian never advised her she had the right to demand that the company settle within the policy limits. Deposition of Fosha, p. 73.

103. Adrian was confident that Fosha understood that if she were to lose the suit, she would be personally responsible for the excess judgment. "Furthermore, her discussion as to whether or not she should claim bankruptcy indicated to me that she had talked to somebody or done something regarding what avenues were available to her." Deposition of Adrian, p. 67.

104. Prior to the first trial, on approximately February 21, 1983, King recalls Fosha stating that her aunt worked for Stites, and that Fosha had discussed her situation with Stites. Deposition of King, p. 79–80.

105. On either the 21st or 22nd of February, 1983, Adrian and King met with Fosha. At that time Adrian learned that Fosha had seen Stites, "or had gone to his office, that she had talked about this case with Mr. Stites, had indicated to Mr. Stites she did not think she had done anything wrong, and that she wasn't at fault for the accident. At that point in time she informed us that it was indicated to her by Mr. Stites that if that was her position or attitude, there was no need to put any additional pressure on the trial attorneys, just go ahead and go to trial. She did not want the case settled." Deposition of Adrian, p. 99–100.

106. King's only contact with any attorney who potentially was representing Fosha was a conversation with Stites which was very brief and something to the effect that Stites had talked with Fosha, and an offer of congratulations for the successful conclusion of the first trial. The conversa-

tion probably occurred after the trial. Deposition of King, p. 57–58, 74.

107. King has no recollection of ever suggesting to Adrian that Adrian suggest to Fosha that she seek independent legal counsel. King vaguely recalls Adrian stating that such advice had been given to Fosha. It is King's belief that such advice was given at the original meeting between Knudson, Adrian, Fosha, and her father on February 24, 1981. Deposition of King, p. 59–60.

108. King has never been consulted by any attorney who wanted to look at the Fosha file, with the exception of plaintiff's counsel. Deposition of King, p. 73–74.

109. King does not believe that anything in writing was received from any attorney claiming to represent Fosha, although it was suggested on several occasions that she consult with her attorney. Deposition of King, p. 58.

110. Adrian's understanding was that Fosha had not retained Stites to represent her regarding the lawsuit. Deposition of Adrian, p. 51.

111. Adrian never provided information or any material from the file relating to the lawsuit to Stites, and it was Adrian's understanding that Stites was not retained to represent Fosha in the lawsuit. He did not know what relationship Stites and Fosha had in terms of consultation. Deposition of Adrian, p. 51.

112. Adrian never received any communication from Stites concerning the Fosha file, nor did he ever have a discussion with Stites concerning the case. Deposition of Adrian, p. 49–50.

113. Adrian has never had any contact with Stites relating to the Stetler–Fosha lawsuit. Deposition of Adrian, p. 135.

114. Adrian never had any communication or contact from an attorney representing Lewis Hagedorn. Deposition of Adrian, p. 66.

115. The February, 1983 trial resulted in a jury verdict finding 70% of the fault was Stetler's and 30% of the fault was

Fosha's. Plaintiff's Exhibit (unnumbered) *Stetler v. Fosha,* No. 81 C 19, Journal Entry, p. 2, District Court of Riley County, Kansas, February 23, 1983.

116. Stetler appealed the verdict of the 1983 trial. On June 14, 1984, the Kansas Court of Appeals reversed and remanded *Stetler v. Fosha* for a new trial. Adrian petitioned the Supreme Court of Kansas for review, which was denied on September 6, 1984. Deposition of Adrian, p. 73–74.

117. On August 29, 1984, Fosha called Adrian to determine the status of the appeal to the Kansas Supreme Court. A decision had not yet been reached. Adrian summarized the conversation in a memo to the file:

> ... We then discussed the facts of this case and the potential exposure to her if she should lose. I informed her that there was, in my opinion, a good chance of a $1,000,000 judgement against her if, in fact, the fault was shown to be attributable to her and not to plaintiff. She then discussed whether or not this matter should be settled and I informed her that I thought the facts favored her, however, sympathy did, in fact, favor the plaintiff. In any event, I instructed her that if she had any questions regarding whether or not this should be settled, to contact another attorney. She wanted to talk to her parents and other individuals and see what her opinion was regarding settlement, but, that at this time, did not want to inform me either way.

Deposition of Adrian, Exhibit # 2.

118. The basis for King's recommendation that Farmers tender their policy limits to the plaintiff in 1985 was Stetler's favorable impression as a witness during the first trial, the complications and additional surgeries which Stetler had undergone or was to undergo to correct difficulties with his injury; the probability that the trial would occur in a courtroom that King did not feel was advantageous; the difficulty in locating a couple of witnesses which King considered material; the statistical probability that plaintiff would be more successful on a second trial; and adverse publicity concerning the Court of Appeals

decision in Manhattan newspaper. Deposition of King, p. 86–88, 98.

119. Stetler's medical expenses related to the collision injury continued to increase following the first trial in 1983. Interoffice correspondence of Farmers, dated March 28, 1985, indicates that Stetler had incurred an additional $20,000.00 in medical bills at that time and anticipated additional surgery in the future. Defendant's Exhibit # D62.

120. By letter to King dated April 9, 1985, Farmers authorized his firm to make an offer of $25,000 to Stetler's attorney, Ward. By letter dated April 12, 1985 to Ward, Adrian made an offer, good only for thirty (30) days, to settle for $25,000. Stetler did not accept the offer. Deposition of Adrian, p. 74, 76 and 124, and Exhibit 7.

121. Fosha was unaware that Farmers offered to settle the case with Stetler for the policy limits. Deposition of Fosha, p. 80.

122. Farmers' offer of $25,000.00 to settle the plaintiff's claim in full was limited to thirty days from April 12, 1985. Deposition of Adrian, exhibit # 7.

123. On May 14, 1985, Adrian sent a letter to Rebecca J. Haney, Branch Claims Manager for Farmers Insurance Group, regarding negotiations in the Stetler–Fosha litigation. Adrian enclosed a copy of a letter from plaintiff's counsel indicating a rejection of the $25,000 settlement proposal made by Farmers, and counter-offering to settle for a sum of $250,000.00. Adrian stated a belief that the $250,000 settlement proposal should be rejected and preparation for trial should begin. Deposition of Adrian, Exhibit # 7.

124. After the offer to plaintiff, and plaintiff's counter-offer, were refused by the respective parties, the action was dismissed without prejudice and refiled in federal court in Wichita, Kansas. A second trial then occurred on May 4, 1987, in Topeka, which resulted in a verdict for the plaintiff and a finding of 49% fault to the plaintiff and 51% fault to the defendant. Deposition of Adrian, p. 74.

125. By an "Offer of Judgment" mailed April 20, 1987, to Stetler's lawyer (Ward), King, on behalf of Fosha, offered to allow plaintiff to take judgment against her in the sum of $25,000 "inclusive of costs accrued to date". The offer stated it would be deemed withdrawn if not accepted within ten (10) days of service on Ward. Deposition of Adrian, p. 76 and Exhibit 7 thereto. The offer was not accepted.

126. After the conclusion of the second trial, King sat down with Fosha and her father and again suggested that they consult with their own counsel. Deposition of King, p. 72.

127. The deposition of Fosha was taken on April 16, 1988. In her deposition testimony she indicated that at the time of the collision she was unaware of the limits of liability insurance on the car she was driving. She first learned the amount of insurance from her attorneys prior to the first trial in Manhattan, Kansas. Fosha does not recall exactly when she learned the amount of insurance, but believes it was the day the trial began. Fosha has no recollection of being told, prior to the first day of trial that she would be responsible for any judgment in excess of $25,000, but would not dispute the statement of Adrian or Knudson that they had explained her liability for any excess judgment prior to that time. Deposition of Fosha, p. 12, 17, 20.

128. Fosha never retained an attorney to represent her in any proceedings from the date of the collision through April 16, 1988. Deposition of Fosha, p. 57.

129. Adrian told Fosha, prior to the first trial, that she had a right to request that Farmers Insurance pay its $25,000 policy limit to Stetler in order to settle the case. She was told she had such a right on the first day of the first trial and perhaps before that. Deposition of Fosha, p. 25 and 26. Fosha understood this to mean that the insurance company would take into account her decision, her feelings. Deposition of Fosha, p. 60; deposition of Adrian, p. 104.

Fosha has no recollection of Adrian or King telling her the first day of the first

**1450**

trial that if she wanted the policy limits paid they would call Farmers to see what their position was. Deposition of Fosha, p. 26–27.

130. No attorney ever advised Fosha of her right to demand Farmers settle the case within the policy limit of $25,000, or less, or that if she demanded Farmers settle within the policy limit, that Farmers might become liable for any excess judgment in place of herself. Deposition of Fosha, p. 61–62.

131. Fosha testified that she never spoke with any attorney concerning her case other than Adrian, Knudson or King. Fosha stated her aunt worked for attorney Stites, but she had no recollection of specifically talking with him concerning the case. Fosha was aware that she had the right to discuss her situation with the attorney of her choice. Fosha was aware that she had the right to request that the insurance company pay the policy limits. She was told she had such a right on the day of the first trial and perhaps before that. Fosha never requested that the policy limits be paid to Stetler. Fosha has no recollection of Adrian or King telling her on the first day of trial that if she wanted the policy limits paid they would call Farmers to see what their position would be. Deposition of Fosha, p. 23–27.

132. Fosha was never advised by any attorney concerning her legal rights as an insured to demand the insurance company pay the policy limits for settlement of a lawsuit; or that if she demanded settlement of the case within policy limits that Farmers Insurance Group might have become liable for any excess judgment in place of herself. Deposition of Teresa Hagedorn Fosha, p. 60–62.

## CONCLUSIONS OF FACT AND LAW

1. The United States Court for the District of Kansas has jurisdiction over the parties hereto and the subject matter hereof.

2. The law governing the issues in this lawsuit is the law of Kansas.

3. In order for plaintiff to recover, it must be shown, by a preponderance of the evidence, that Farmers was guilty of bad faith and/or negligence in the handling and defense of Stetler's claim against the insured, Fosha.

4. A conflict of interest for the insurer exists whenever an injured claimant seeks compensation from an insured in excess of the insurance policy limits. *Bollinger v. Nuss*, 202 Kan. 326, 336, 449 P.2d 502 (1969). The duty of an insurer who undertakes in the defense of an insured in such a situation is to give consideration to the interests of the insured that is, at least, equal to the consideration given to the interests of the insurer. *Id.*

Good faith on the part of the insurer requires honesty, fair dealing and complete disclosure of all material information between the insurer and the insured. *Id.* at 341, 449 P.2d 502.

Breach of this duty is bad faith in the defense of the insured's interests, and subjects the insurer to liability for the total amount of loss incurred by the insured, regardless of the limits of coverage provided by the insurance contract. *Id.* at Syl. # 1; *Rector v. Husted*, 214 Kan. 230, Syl. # 1, 519 P.2d 634 (1974).

5. The duty of an insurer who undertakes the defense of an insured against a third-party claimant is to avoid subjecting the insured to any risk that would not be undertaken by a reasonable, prudent person in the management of their own business affairs. *Bennett v. Conrady*, 180 Kan. 485, 490, 305 P.2d 823 (1957).

When the financial risk posed greatly exceeds the limits of coverage provided by the insurance policy, the primary objective of the insurer must be to contain the liability of the insured within those policy limits and to avoid unreasonably subjecting the insured to risk of personal loss. *Bollinger, supra*, 202 Kan. at 336, 449 P.2d 502 (stating the primary issue "is the degree of consideration which an insurer must give to the interests of the insured which conflict with its own.")

Determination of what is reasonable risk in this context requires consideration both

of the extent by which an excess judgment might exceed the limit of coverage, and the financial resources available to the insured to meet such a judgment, as well as consideration of the factual record.

Breach of this duty is negligence in the defense of the insured's interests, and subjects the insurer to liability for the total amount of loss incurred by the insured, regardless of the limits of coverage provided by the insurance contract. *Rector, supra,* 214 Kan at Syl. # 1, 519 P.2d 634; *Bollinger, supra,* 202 Kan. at Syl. # 1, 449 P.2d 502.

6. The liability of Farmers for bad faith or negligence in the defense of Fosha depends on the circumstances. The circumstances of this case relevant to a determination of Farmer's liability for bad faith or negligence include:

A. *Conflict of interest:* Because the demand Stetler made on Fosha exceeded the coverage provided by the policy, Farmers' duty to defend Fosha created a conflict of interest between Fosha and Farmers. Because plaintiff's offer to settle within policy limits, made prior to trial, was for the full amount of the policy limit, the existing conflict was particularly acute.

B. *Magnitude of risk to the insured:* The possibility of an adverse judgment against Fosha on the issue of liability for Stetler's injuries posed a financial risk of great magnitude to Fosha. By the estimate of Farmers counsel, the risk could reach $1,000,000.00, 40 times the amount of the policy limits. Relatively, the risk posed to Farmers was minimal, because the insurance contract limited any possible payment to no more than $25,000.00.

C. *Strength of the claimant's case:* The evidence supporting Stetler's claim on the issue of liability, while not as weighty as evidence supporting Fosha's defense, was substantial. The evidence supporting Stetler's claimed damages was substantial, convincing and almost conclusive.

D. *Quality of the insurer's investigation:* While Farmers made an adequate investigation into the circumstances of the collision to reveal the existence of evidence adverse to Fosha, Farmers and its agents failed to apportion appropriate weight to such adverse evidence when determining whether to negotiate with Stetler on the subject of settlement.

E. *Insurer's evaluation of advice of counsel or agents:* Farmers' counsel identified some risks in taking the defense of Fosha to a jury, yet Farmers and its agents failed to apportion appropriate weight to such risks when determining whether to negotiate with Stetler on the subject of settlement.

F. *Evidence of fault on the part of the insured:* There is no evidence Fosha mislead Farmers regarding the facts of the collision so as to induce or contribute to Farmers' failure to timely negotiate regarding settlement of Stetler's claim.

G. *Good faith duty of honesty, fair dealing, and adequate information:* Acts of commission and omission by Farmers, its agents and counsel, particularly the failure of Farmers' agents to fully inform Fosha of 1) information adverse to Fosha as it became available; 2) the existence of Farmers' conflict of interest; 3) Fosha's legal rights, status and obligations in regard to a demand for settlement; and 4) Fosha's rights and obligations as provided in the insurance policy, shows a subordination of Fosha's interests to those of the company, thereby violating Farmers' duty to act in good faith.

7. The existence of bad faith or negligence in the handling of an insured's defense by an insurer results in the insurer being liable for the full extent of the insured's loss, even in excess of the policy limits. To avoid acting in bad faith, Farmers was required to give the same, or equal, consideration to the interests of Fosha as it gave to its own interests. To avoid negligence in the defense of Fosha's interests, Farmers was to act in a manner consistent with those of a reasonable, prudent person in the handling of his own business affairs.

8. The awareness of Fosha's attorneys, as Farmers' agents, that an independent attorney would recommend settlement within policy limits, to protect Fosha from excess liability, coupled with their failure to advise Fosha as an independent attorney would, is evidence of bad faith and negligence in the handling of Fosha's defense.

9. The failure of Fosha's attorneys and Farmers' agents, to adequately assess the quality of evidence adverse to Fosha, coupled with the subsequent decision to take the issue of Fosha's negligence to a jury, indicates a negligent disregard for the duty owed Fosha under the contract to protect her interests.

10. Assumptions made on the part of Fosha's attorneys, as Farmers' agents, that Fosha was receiving adequate counsel regarding her rights and obligations from other sources, without making any effort to verify that assumption and while aware that no other attorney had contacted them in regard to the information contained in their files, indicates a negligent disregard for the duty owed Fosha under the contract to protect her interests.

11. The court concludes that when, as in the present action, the existence of a conflict of interest between representation of the insurer and the insured is not disclosed, and entry of an excess judgment occurs prior to the insured being fully advised of the legal rights and obligations resulting from that conflict of interest, the insurer has breached its duty to act in good faith.

12. In the present action, the court concludes that Farmers' act of taking the issue of Fosha's liability before a jury, to be decided on a factual record which contained evidence unfavorable as well as favorable to Fosha, without having first timely explored the possibility of containing the exposure of Fosha through settlement, subjected Fosha to unreasonable risk and was therefore negligent. *See Rector, supra,* 214 Kan. at 241–42, 519 P.2d 634 (finding reasonable attempts must be made to protect a vulnerable insured from exposure to personal liability).

13. A preponderance of the evidence shows that Farmers was guilty of negligence and bad faith in its overall handling of the contractual and legal duties owed its insured, Fosha.